UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRACY S. SARGENT**<br>**386 Wiley Road**<br>**Cedartown, G.A. 30125**<br><br>*Plaintiff,*<br><br>v.<br><br>**MICHAEL R. POMPEO, SECRETARY OF STATE**<br>**U.S. Department of State**<br>**2201 C Street N.W.**<br>**Washington, D.C. 20037**<br><br>*Serve*:<br><br>**JESSIE K. LIU, U.S. ATTORNEY FOR THE**<br>**DISTRICT OF COLUMBIA**<br>**United States Attorney's Office**<br>*Attn*: **Civil Process Clerk**<br>**555 4th Street N.W.**<br>**Washington, D.C. 20530**<br>*Via U.S.P.S. Certified Mail*<br><br>**WILLIAM P. BARR, ATTORNEY GENERAL**<br>**U.S. Department of Justice**<br>**950 Pennsylvania Avenue, N.W.**<br>**Washington, D.C. 20530-0001**<br>*Via U.S.P.S. Certified Mail* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Civil Action No.** _____<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

| | |
|---|---|
| **SOC LLC** | ) |
| **15002 Northridge Drive** | ) |
| **Suite 100** | ) |
| **Chantilly, V.A. 20151** | ) |
| | ) |
| *Serve Registered Agent:* | ) |
| | ) |
| **CT CORPORATION SYSTEM** | ) |
| **4701 Cox Rd.** | ) |
| **Suite 285** | ) |
| **Glen Allen, V.A. 23060** | ) |
| | ) |
| *Defendants.* | ) |

## CIVIL COMPLAINT FOR EQUITABLE AND
## MONETARY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Tracy S. Sargent ("Sargent") brings this suit against the U.S. Department of State ("State Department") and SOC LLC ("SOC") (collectively, "Defendants") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*. ("Title VII"), namely for acts of discrimination, retaliation, and hostile work environment. Sargent also brings a claim against Defendants for intentional infliction of emotional distress in violation of District of Columbia common law.

## INTRODUCTION

1.     Defendants' employees and agents subjected Sargent to severe and pervasive sexual harassment while Sargent worked as a Kennel Master at the Embassy of the United States of America in Baghdad, Iraq ("Embassy").

2.     When Sargent complained to SOC management that State Department employee Donnie Dollinger ("Dollinger") was sexually harassing her, SOC removed her from Baghdad and subsequently fired her.

2

3.      Approximately one month after SOC removed Sargent from Baghdad, the State Department issued Sargent a Loss of Confidence letter barring her from working any future State Department contracts—effectively ending her career as a U.S. government contractor.

4.      Following an Office of Inspector General investigation, the State Department admitted that Sargent's complaint of sexual harassment was a protected disclosure and the State Department rescinded the Loss of Confidence letter.

5.      The State Department subsequently initiated an Office of Civil Rights investigation into whether Defendants' conduct was retaliatory. This investigation is ongoing.

6.      Defendants' conduct has irreversibly damaged Sargent's career and caused her severe emotional distress.

## PARTIES

7.      Sargent is a resident of Cedartown, Georgia, and was employed by Defendants from approximately June of 2017 to on or about October 16, 2017 as a Kennel Master at the Embassy.

8.      The State Department is the federal executive department that runs the Embassy and advises the President on international relations and has its headquarters in Washington, D.C.

9.      SOC is a commercial company that provides integrated security and critical infrastructure solutions for the U.S. Government and commercial customers, and has its headquarters in Chantilly, Virginia.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it asserts claims that arise under the laws of the United States, specifically Title VII.

11.     This Court has supplemental jurisdiction over Sargent's tort claim pursuant to 28 U.S.C. § 1367 because the facts that support Sargent's state law tort claim are the same as alleged for her federal claims.

12.     Venue in this district is proper under 28 U.S.C. § 1391(b) both because a named Defendant resides within this judicial district, and a substantial part of the events giving rise to Sargent's claims occurred within this judicial district.

## ADMINISTRATIVE EXHAUSTION

13.     Sargent filed a timely charge of discrimination, retaliation, and hostile work environment against SOC with the U.S. Equal Opportunities Employment Commission ("EEOC") on June 12, 2018.

14.     The EEOC has not issued Sargent a Notice of Right to Sue, and more than 180 days have elapsed since Sargent's timely filing.

15.     Sargent has properly exhausted her administrative remedies with the EEOC.

16.     Sargent filed a timely formal complaint of discrimination, retaliation, and hostile work environment against the State Department with the State Department's Equal Employment Office ("EEO") on May 18, 2018.

17.     The EEO has not issued Sargent a Notice of Right to Sue, and more than 180 days have elapsed since Sargent's timely filing.

18.     Sargent has properly exhausted her administrative remedies with the EEO.

19.     Sargent timely filed a Notice of Claim Presented ("Notice") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 *et seq.*, with the State Department's Office of the Legal Advisor on August 14, 2018.

20.     Sargent's Notice provided the State Department with enough information for the State Department to initiate and investigate Sargent's claims, and specified a sum certain for injury in the amount of $5,000,000.

21.     The State Department has not issued Sargent a Denial of Claim, and more than 180 days have elapsed since Sargent sent the timely Notice to the State Department.

22.     Sargent has properly notified the State Department pursuant to 28 U.S.C. § 2401(b).

## FACTUAL ALLEGATIONS

**Sargent is an experienced K9 specialist with an outstanding track record of work in extreme environments.**

23.     Sargent is a 50-year-old female. She has worked in public safety for over 26 years.

24.     Sargent specializes in canine ("K9") safety and security; she trains and handles K9s that can sniff out explosives, detect human remains, and track missing persons. She works with law enforcement officers, government officials, soldiers, and private civilians. Sargent is nationally recognized as an expert in her field and has used her K9 expertise to assist in numerous high-profile search, rescue, and recovery missions.

25.     Numerous media outlets, including crime talk shows, national news programs, several movies, and international documentaries have featured Sargent and her K9s. Sargent has also been issued numerous awards and commendations for her work as a K9 specialist.

26.     Demand for K9 specialists increased significantly following the U.S. deployments to Iraq and Afghanistan.

27.     From approximately 2011 to 2013, Sargent served as a K9 Handler for the Triple Canopy High Threat Protection Advance Team in Baghdad, Iraq. This elite team was specifically tasked with protecting the U.S. Ambassador and other high-level officials.

28.     During her time in Iraq, Sargent's team conducted missions in both the red and green zones.

**SOC recruited and hired Sargent as a Kennel Master and then promoted her to Operations Kennel Master.**

29.     SOC recruited Sargent in 2016. The company had a lucrative State Department contract to protect the Embassy in Baghdad, Iraq, and SOC needed experienced Kennel Masters.

30.     Sargent initially rejected SOC's offer of a K9 handler position. Several months later, SOC again reached out to Sargent, and offered her a Kennel Master position, which she accepted.

31.     Sargent's first day as a SOC employee in Baghdad was July 12, 2017.

32.     As Kennel Master, Sargent was a supervisor for multiple K9 Bomb Detection Teams. Her job duties included general management of both the K9 handlers and their K9s. Her direct supervisor was Kyle Lindsey ("Lindsey"), the Operations Kennel Master.

33.     Sargent roomed with the only other female Kennel Master on the contract, Jodi Becker-Spiker ("Becker-Spiker").

34.     Sargent quickly earned praise for her work at the Embassy. Because Defendants' had not yet provided her with her blue-level clearance badge, Sargent worked her first five days without pay.

35.     Less than two weeks after she arrived at the Embassy, Lindsey went on leave, and SOC promoted Sargent to Operations Kennel Master.

36.     This placed Sargent—one of only two female Kennel Masters—in a management role over her male co-workers. Almost immediately, Sargent began to experience discrimination, harassment, and hostility from the male Kennel Masters.

**Sargent's male coworkers created a hostile work environment.**

37.     Sargent's male coworkers spoke frequently of sex, using derogatory references to women. Sargent observed that these men enjoyed making the female contractors uncomfortable with their conversations of sex.

38.     Sargent's male co-workers often referred to women as "bitches," using the term for women. They would often use the term in reference to their sexual exploits, saying things like, "I really gave it to that bitch."

39.     When female contractors walked to the Embassy cafeteria, male contractors would crane their necks and wolf-whistle at the female contractors.

40.     The male contractors' hostility to female contractors was reflected in the assignment of duties and a lack of adherence to established procedures.

41.     Sargent's supervisors would assign the least desirable duties to Sargent and Becker-Spiker, such as cleaning and administrative paperwork.

42.     At one point, Sargent's direct supervisor, Lindsey, ordered Sargent to conduct her post checks alone. Post checks require that at least two armed personnel perform the check.

43.     This was not only a violation of safety protocols and contract requirements, it placed Sargent in serious physical danger.

**State Department employee – and Sargent's supervisor – Donnie Dollinger sets his sights on Sargent.**

44.     Shortly after she arrived in Baghdad, Sargent was introduced to State Department employee Donnie Dollinger.

45.     In his role as the Government Technical Monitor, Dollinger was responsible for making sure SOC was meeting its requirements under the State Department contract.  He was assigned to oversee the K9 Operations Program. This placed Dollinger in a position of unique authority over Sargent.

46.     Dollinger exercised a great deal of control over Sargent's employment, as well as her day-to-day work.

47.     Dollinger would accompany Kennel Masters and K9 handlers on post checks and would supervise their work. Dollinger would often provide feedback and training to the Kennel Masters.

48.     Dollinger controlled minute details of the Kennel Masters' work, including what shifts they worked, which posts were visited, and how many dogs were brought on each visit.

49.     Dollinger also approved requests for the equipment used in the Kennel Masters' place of work, such as requests for ice chests or air conditioners.

50.     Dollinger's view of Kennel Masters and K9 handlers was taken with great weight by SOC supervisors, and Dollinger was part of Sargent's direct chain of command.

51.     Dollinger would often order Sargent to perform day-to-day tasks, such as collecting and preparing a vehicle for him, or preparing training reports.

52.     Prior to being formally introduced to Dollinger, Becker-Spiker had warned Sargent to "be wary" of Dollinger, as Dollinger had a reputation for aggressively pursuing women.

53.     Dollinger immediately began to harass Sargent.

54.     In or around July of 2017, Sargent was eating lunch in the Embassy cafeteria. She was joined by Dollinger, Lindsey, and K9 Program Manager Howard Cotton ("Cotton"). This was the first face-to-face interaction Sargent had with Dollinger.

55.     Dollinger, sitting across the table, asked Sargent whether she was married.

56.     Sargent said no, she was not married.

57.     Dollinger asked Sargent, "How many boyfriends do you have?"

58.     Sargent replied, "I have one boyfriend. He is a wonderful man." Sargent hoped her comment would dissuade Dollinger from continuing to ask about her romantic life.

59.     Dollinger replied, "You need to have more than one boyfriend.  You need to have a lot of boyfriends."

60.     Sargent looked pointedly at her supervisors Lindsey and Cotton in the hopes that they would intervene, but neither Lindsey nor Cotton said anything to Dollinger about his comments.

61.     Sargent reiterated to Dollinger, "I have only one boyfriend and only want one boyfriend."

62.     Sargent then suggested that they change the subject.

63.     Dollinger continued to stare at Sargent throughout her lunch, which made her feel uncomfortable and intimidated.

64.     Dollinger's aggressive and sexist behavior continued throughout Sargent's time in Baghdad.

65.     When he looked at Sargent, Dollinger would slow direct his gaze down the entirety of her body.

66.     Dollinger would frequently leer at Sargent's breasts and body in a sexual manner.

67.     Dollinger would also invade Sargent's personal space in a sexual manner. He would frequently move his body within inches of hers, causing her to recoil and step away. This would most often occur in the cafeteria, or on the Embassy sidewalks. When Sargent would pull away, Dollinger would smirk or laugh.

68.     Though Dollinger went on leave during or around the month of August 2017, Dollinger continued this aggrieve sexual behavior towards Sargent when he returned.

69.     Sargent continued to rebuff Dollinger's sexual comments and advances when he returned from leave.

**Dollinger and the male Kennel Masters demote and isolate Sargent and the other female Kennel Master.**

70.     After Sargent rebuffed Dollinger's sexual behavior and advances, Dollinger, with the help of other male Kennel Masters and her supervisors, began to engage in a pattern of retaliatory behavior.

71.     Dollinger, Cotton, and Lindsey are friends. Dollinger and Cotton would meet on leave to drink together.

72.     A week after Lindsey returned from his August 2017 leave, he demoted Sargent to Duty Kennel Master even though she received high marks as Operations Kennel Master.

73.     Lindsey claimed Sargent needed a better "foundation."

74.     Lindsey further claims that Sargent's promotion to Operations Kennel Master "wasn't supposed to happen and wasn't part of the plan."

75.     Lindsey then promoted Stevens, his friend and male coworker to Operations Kennel Master.  Stevens repeatedly said he did not even want the position, as "it was too much work and responsibility."

10

76. Lindsey then told Sargent that Kennel Master Ian Spivey ("Spivey"), who had been in Baghdad for just a short time but was Lindsey's friend, that Spivey would be Lindsey's "second in command."

77. Lindsey told Sargent that Sargent was to obey "whatever [Spivey] says or wants."

78. Spivey, Dollinger's friend and Sargent's male co-worker, started blowing cigarette smoke in Sargent's face when Sargent came to the Kennel Master's office to report for work.

79. Spivey knew that Sargent was allergic to cigarette smoke as Sargent had previously emailed several of her coworkers, including Spivey, to inform them of her allergy. She asked that her coworkers not smoke directly outside the Kennel Master office, both for Sargent's health as well as the welfare of the K9s.

80. Her request prompted an escalation of the harassment by Spivey and other male Kennel Masters.

81. Lindsey ordered Sargent and Becker-Spiker— the only two female Kennel Masters— to "stay put" in the Kennel Master office as much as possible, despite their need to perform post checks. Sargent often sat in the Kennel Master office for up to 10 hours a day.

82. Lindsey did not give this "stay put" order to the male Kennel Masters.

83. Lindsey and Stevens regularly came into the Kennel Master office to check that Sargent was sitting in the Kennel Master office and not conducting post checks. This occurred at all hours of the day and on even on days where Lindsey and Stevens were off-duty.

84. As a result of Lindsey's "stay put" order, the male Kennel Masters were permitted to do field work, relax in their rooms, play video games, have long lunches, and simply disappear

for hours at a time, while the female Kennel Masters were confined in the Kennel Masters' office.

85.     Sargent was not allowed or invited to meetings regarding the K9 Operations Program. Lindsey's order relegated her to performing administrative tasks in the Kennel Master office.

86.     Because Sargent was forced to comply with Lindsey's "stay put" order, she was not able to perform the post checks that were part of her core responsibilities as a Kennel Master.

87.     Sargent advised Lindsey several times that she had nothing to do in the office and requested additional assignments or tasks.  She also advised Lindsey that her knowledge and skills were not being utilized and requested additional duties.

88.     Lindsey told Sargent was to "stay put" in the Kennel Masters office as ordered.

89.     Despite the hardship caused by this retaliation, Sargent continued to rebuff Dollinger's sexual comments and advances.

90.     In or around September of 2017, Lindsey ordered Sargent to report to his office alone. Lindsey accused Sargent of being "standoffish," and "snobby" for not eating with the male Kennel Masters when Sargent ate breakfast alone that day

91.     Sargent explained that she simply did not see any other Kennel Masters at breakfast, and therefore ate alone.

92.     Lindsey replied that he was happy to hear this, and that he feared Sargent was turning into "another Dietra." Dietra is a female SOC supervisor within Lindsey's chain of command.

93.     Lindsey continued by saying, "[Dietra] used to be friendly, but she turned into a fucking bitch."

12

94.     On multiple occasions during her time in Baghdad, Sargent's male Kennel Masters impressed upon her that they were "family." Lindsey was particularly emphatic about this following his return from leave, and shortly following his demotion of Sargent.

95.     Sargent took this to mean that she was expected to be submissive and loyal, and that any disloyalty would be punished.

96.     Lindsey commented during staff meetings that he had to "fix" the Kennel Masters before he could "fix" the K9 handlers.

**Dollinger subjects Sargent to severe sexual harassment on a post check.**

97.     On or around September 13, 2017, Sargent was scheduled to conduct post checks at various International Zone checkpoints.

98.     While Sargent was scheduled – on paper – for post checks throughout this period, part of Lindsey's "stay put" routine was to tell Sargent verbally that she was not to go on the post check, and he would instead allow one of the male Kennel Masters to take the post check.

99.     On September 13, 2017, however, Lindsey did not give Sargent his customary "stay put" order, so Sargent prepared for the post check.

100.    Sargent drove and picked up a K9 handler named Rich and a veterinary technician named James for the training. When Sargent arrived at the pick-up point for the K9 handler and the veterinary technician, Dollinger was also there to accompany them on the post checks.

101.    As soon as Sargent started driving to the checkpoint, Dollinger and Rich began talking about the "popcorn TV" they had been watching.

102.    When Rich began to describe the anal sex act he had watched, Sargent realized they were discussing a pornographic television show.

13

103.    As Rich described how he much he had enjoyed watching the episode with anal sex, Dollinger chimed in, graphically discussing how much he also loved anal sex.

104.    Dollinger exclaimed to the occupants of the car that "the bitches really love anal sex."

105.    Dollinger and Rich continued to discuss pornography and their sexual desires. Dollinger recalled another episode of popcorn TV that portrayed oral sex.

106.    Dollinger again exclaimed that "whores are great at giving blow jobs."

107.    As the men in the vehicle traded stories of sex and pornography, they became increasingly excited and explicit.

108.    Dollinger directed his sexual commentary at Sargent, and he was visibly enjoying how clearly uncomfortable he made her feel.

109.    Sargent did her best to focus on driving the armored vehicle, and ignore the disgusting conversation.

110.    As the vehicle passed a male Iraqi guard, Dollinger pointed at him, and told Sargent that she needed to "kiss that guard." Dollinger continued, "He would really get off being kissed by a blonde American woman" or words to that effect.

111.    A few minutes later, the vehicle passed another male Iraqi guard. Again, Dollinger told Sargent that she needed to kiss the guard, and "get him off."

112.    The vehicle arrived at the post designated for the training check.

113.    While conducting training during the post check, Sargent was standing outside near an Iraqi supervisor and Iraqi guards. Dollinger noticed the Iraqi men looking at Sargent and leaned in Sargent's ear, and whispered, "Look at that Iraqi guard looking at you. You need to get him off."

114.    Dollinger continued these and similar comments for about two hours until the group had returned from the checkpoint.

115.    As the men escalated in their excited conversation about pornography, anal sex, oral sex, and how much "bitches" like it, Sargent became increasingly aware of how vulnerable she was.

116.    Throughout this episode, Sargent grew increasingly terrified that she would be sexually assaulted by one or more of the men in the vehicle.

117.    At this point, Sargent was outside of the protective walls of the Embassy and the only female in the vehicle. She was completely at the mercy of the men in the vehicle, one of which was her supervisor.

118.    Sargent is a survivor of a prior sexual assault. She felt trapped in the vehicle, a feeling she associated with her prior sexual assault.

119.    The men—especially Dollinger—appeared to enjoy making Sargent afraid and uncomfortable, which only increased their excitement.

120.    Sargent's fear was so acute that her combat training kicked in. She began to play scenarios in her head—where she would dive out of the vehicle or use her service pistol to defend herself if the men became violent.

121.    When Sargent returned from the trip to the checkpoint, she was emotionally and physically shaken.

122.    Shortly after she returned from the post check, Lindsey called a meeting of the Kennel Masters. Sargent attended, though still shaken from Dollinger's conduct.

123.    During the meeting, Lindsey locked eyes with Sargent.

15

124.     Lindsey then said, directly to Sargent, "Donnie [Dollinger] is a great guy, and we need to support him in every way. He has done a lot of great things for our program and we need to make sure we keep him happy. He means the things he says…" or words to that effect.

125.     Lindsey, eyes still locked with Sargent's, then said, "You need to make sure you give him whatever he wants to make him happy" or words to that effect.

126.     Sargent understood this to mean that Lindsey wanted her to submit to Dollinger's sexual advances.

**Sargent reports the sexual harassment to SOC.**

127.     Immediately following this meeting, Sargent drafted and sent an urgent complaint to SOC's President and Human Resources Director, reporting the extreme sexual harassment and discrimination she was suffering.

128.     Fearing for her safety, Sargent accepted SOC's offer to remove her from Baghdad, and Sargent returned to the United States on or around September 15, 2017.

129.     SOC promised Sargent that it would investigate her complaint fully. Sargent, in the belief that SOC would follow through on its promise, expressed her willingness to return to Iraq following the investigation and corrective measures from SOC and the State Department.

130.     However, when Sargent attempted to follow up with SOC on the status of their investigation, she was met with silence.

131.     Sargent's repeated calls and emails went unanswered.

**SOC terminates Sargent's employment and the State Department issues her a Loss of Confidence letter.**

132.     On October 19, 2017, Sargent called Bonnae Vega, SOC Human Resources Director, from Sargent's Cedartown Georgia home. Vega answered the phone.

16

133.    Vega told Sargent that SOC was terminating her employment, and that the State Department had issued Sargent a Loss of Confidence letter. A Loss of Confidence letter bars employees from working on U.S. Government contracts. It also bars employees from working on other contracts that require a certain security clearance.

134.    Sargent felt like she was punched in the stomach.

135.    Sargent felt deeply betrayed by both SOC and the State Department because she had been fired, and she could no longer work as a contractor—reporting the severe sexual harassment she had endured had now ended her career.

136.    Sargent struggled to catch her breath and was disoriented on the phone with Vega. Again, and again, Sargent repeated "I don't understand," and "this is wrong."

137.    Immediately following the call, Sargent vomited violently, choking and retching in her bathroom.

138.    Sargent vomited two more times that same day.

139.    Since learning of the Loss of Confidence letter, Sargent has suffered from continuous vomiting, acid reflux, headaches, and sleeplessness.

140.    Sargent has further suffered persistent and chronic anxiety, depressed mood, and crying spells. She has become isolated from her friends, family, and her boyfriend and she has struggled with maintaining interpersonal relationships.

141.    Sargent has sought out and received professional psychiatric treatment for her severe emotional distress.

**The State Department investigates Sargent's Complaint.**

142.     Following an Office of Inspector General investigation, the State Department admitted that Sargent's complaint of sexual harassment was a protected disclosure and rescinded the Loss of Confidence letter.

143.     The State Department subsequently initiated an Office of Civil Rights investigation into whether Defendants' conduct was retaliatory. At the time of this filing, this investigation is ongoing.

144.     As of the date of this filing, both SOC and the State Department have refused to provide Sargent with a copy of the Loss of Confidence letter.

145.     Since her removal from Baghdad, Sargent's former male co-workers have traded stories that Sargent "couldn't take it," despite her prior exemplary work in combat environments.

146.     Defendants' conduct has irreversibly damaged Sargent's career and caused her severe emotional distress.

**COUNT I**
**Discrimination (Sex)**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000(e),** *et seq.*
**(Against All Defendants)**

147.     Sargent hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

148.     Sargent is an "employee" as the term is defined in 42 U.S.C. § 2000e *et seq*.

149.     The State Department is an "executive agency" as the term is defined in 42 U.S.C. § 2000e-16.

150.     SOC is an "employer" as the term is defined in 42 U.S.C. § 2000e *et seq*.

151.    To establish a *prima facie* case of discrimination under Title VII, Sargent must show that she: (1) suffered an adverse employment action; (2) because of her sex. *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 149 (D.D.C.  2013), quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C.Cir.2008).

152.    Sargent is a female, and therefore a member of a protected class.

153.    Sargent was qualified for her position. She had decades of experience in the public safety and security field, and SOC sought her out for the position.

154.    Sargent's performance at the Embassy was exemplary. She earned praise from her co-workers, and SOC promoted her just two weeks after she arrived in Baghdad.

155.    Sargent, a female, was treated worse than her male coworkers on account of her sex.

156.    Sargent suffered an adverse employment action when she was demoted, subjected to a hostile work environment, issued a Loss of Confidence Letter, and ultimately fired.

### COUNT II
**Hostile Work Environment**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000(e), *et seq.***
**(Against All Defendants)**

157.    Sargent hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

158.    Sargent is an "employee" as the term is defined in 42 U.S.C. § 2000e *et seq*.

159.    The State Department is an "executive agency" as the term is defined in 42 U.S.C. § 2000e-16.

160.    SOC is an "employer" as the term is defined in 42 U.S.C. § 2000e *et seq*.

161.    To state a claim for hostile work environment, Sargent must show that: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with the employee's work performance and created an intimidating, hostile, or offensive working environment; and (5) the employer may properly be held liable. *Leach v. Nat'l R.R. Passenger Corp.*, 128 F. Supp. 3d 146, 154 (D.D.C. 2015), quoting *Davis v. Coastal Int'l Sec.*, Inc., 275 F.3d 1119, 1122–23 (D.C. Cir. 2002)

162.    Lindsey used his position of power as Sargent's supervisor to push her to give in to Dollinger's unwelcome sexual advances. Rather than protecting Sargent from Dollinger's advances, Lindsey directed Sargent to "give [Dollinger] whatever he wants to make him happy."

163.    Sargent's male coworkers regularly referred to women as "bitches," "cunts," and "whores" in the workplace, interfering with Sargent's work performance and creating an intimidating, hostile, and offensive working environment.

164.    Sargent's male coworkers discussed pornography in the workplace, and graphically described anal and oral sex acts in workplace conversation, interfering with Sargent's work performance and creating an intimidating, hostile, and offensive working environment.

165.    Dollinger made numerous sexually charged comments and gestures to Sargent throughout her employment in Baghdad.

166.    Dollinger used his position of power as Sargent's supervisor to force her to endure his sexual comments and advances, and placed Sargent in situations that caused her to be vulnerable to his illegal behavior.

167.    Lindsey used his position of power as Sargent's supervisor to force her to sit idly in the Kennel Master office, while Lindsey let Sargent's male colleagues perform field work and other activities.

168.    The sexual harassment Sargent suffered in Baghdad was so severe that Sargent feared she would be raped or physically assaulted for not giving in to the sexual advances.

169.    The sexual harassment Sargent suffered in Baghdad was so severe that she accepted an immediate removal from the country, with the understanding that she would return once Defendants had taken corrective measures.

170.    The sexual harassment and misconduct Sargent suffered in Baghdad was pervasive and repetitive, and Defendants, as well as Defendants' employees and agents, were aware of the conduct.

## COUNT III
### Retaliation
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000(e), *et seq.*
### (Against All Defendants)

171.    Sargent hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

172.    Sargent is an "employee" as the term is defined in 42 U.S.C. § 2000e *et seq*.

173.    The State Department is an "executive agency" as the term is defined in 42 U.S.C. § 2000e-16.

174.    SOC is an "employer" as the term is defined in 42 U.S.C. § 2000e *et seq*.

175.    To prevail on an unlawful retaliation claim, Sargent must establish: (1) that she made a charge or opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against her; and (3) that the employer took the action because of the

protected conduct. *See Norris v. Wash. Metro. Area Transit Auth.*, 342 F. Supp. 3d 97, 109 (D.D.C. 2018).

176.    Sargent made a charge or opposed a practice made unlawful by Title VII when she complained to SOC about discrimination and sexual harassment on or about September 14, 2017.

177.    Defendants' took a materially adverse action against Sargent when the State Department issued her a Loss of Confidence letter on or about October 15, 2017, and SOC terminated her on or about October 16, 2017.

178.    Defendants' material adverse actions against Sargent occurred almost exactly one month after Sargent's protected conduct under Title VII.

179.    Sargent's protected conduct continued between September 14, 2017 and October 16, 2017, as she attempted to follow up with Defendants regarding their purported investigation into her complaint.

180.    SOC's investigation into Sargent's claims was a sham. SOC did not even interview Sargent – the complaining party – regarding her claims.

181.    Nothing occurred between September 14, 2017 and October 16, 2017, that could reasonably compel the Defendants to issue Sargent a Loss of Confidence letter or terminate her employment.

## COUNT IV
### Intentional Infliction of Emotional Distress (IIED)
### District of Columbia Common Law
### (Against All Defendants)

182.    Sargent hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

183.    Under District of Columbia law, intentional infliction of emotional distress requires Sargent to establish: "(1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Islar v. Whole Foods Mkt. Grp., Inc.*, 217 F. Supp. 3d 261, 267–68 (D.D.C. 2016) (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)).

184.    Defendants and Sargent had a special relationship, as Defendants were responsible for Sargent's physical safety and security in Baghdad, Iraq. SOC and State Department personnel —such as Dollinger—had the authority to regularly make life or death decisions for Sargent.

185.    Defendants, with malicious purpose and wanton disregard of Sargent's emotions, issued or caused to be issued a Loss of Confidence letter to Sargent— effectively ending her career as a U.S. Government contractor— in retaliation for Sargent's protected complaints of severe sexual harassment.

186.    The State Department's extreme and outrageous conduct caused Sargent severe emotional distress, and Sargent continues to suffer that emotional distress.

## **PRAYER FOR RELIEF**

Sargent respectfully requests that the Court enter judgement in her favor and award to her the following relief:

a.      Judgement against Defendants the State Department and SOC in the amount of any wages, salary, employment benefits, or other compensation denied or lost to Sargent, both for her present job and lost wages toward future employment, including economic damages, liquidated damages, compensatory and punitive damages to be determined at trial;

b.      Pre-judgement interest;

c.      Interest due on unpaid wages;

d.      Reasonable attorneys' fees and costs of this litigation;

e.      Reasonable expert witness fees; and

f.      Any other relief that this Court deems just and proper to award.

## JURY DEMAND

Sargent demands a jury for all issues proper to be so tried.

Respectfully submitted,

R. Scott Oswald (D.C. Bar No. 458859)
Adam Augustine Carter (D.C. Bar No. 437381)
The Employment Law Group, P.C.
888 17th St. NW, 9th Floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835(facsimile)
soswald@employmentlawgroup.com
acarter@employmentlawgroup.com

*Attorneys for Plaintiff Tracy S. Sargent*