UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRACY S. SARGENT,<br><br>   *Plaintiff*,<br><br>  v.<br><br>MICHAEL R. POMPEO,<br>Secretary of State, et al.,<br><br>   *Defendants*. | Civil Action No. 1:19-cv-00620 (CJN) |

## MEMORANDUM OPINION

Tracy Sargent took a job as a K9 handler and kennel master with SOC LLC, a government contracting firm responsible for providing security to the U.S. Embassy in Baghdad, Iraq.  Am. Compl. ¶¶ 1, 7, 9, ECF No. 14.  After Sargent reported multiple instances of alleged sexual harassment by a State Department employee, SOC transported her back to the United States and promised to resolve the problem and then return Sargent to the Embassy to continue her work.  *Id.* ¶ 2.  Rather than following through on its promises, SOC fired Sargent and allegedly caused the State Department to censure her, effectively foreclosing any future opportunities as a security contractor.  *Id.* ¶¶ 2–3.  After engaging with the EEOC and various State Department offices, Sargent filed this suit alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and common-law intentional infliction of emotional distress against both SOC and the State Department.  Am. Compl. ¶¶ 163–202.  Pending before the Court are the State Department's Motion to Dismiss the claims against it ("State's Mot."), ECF No. 22, and Sargent's Motion for Leave to Amend the Complaint, ECF

No. 27.  For the reasons explained below, the Court dismisses the claims against the State Department, grants Sargent leave to amend in part, and denies leave to amend in part.

## I.      Background

Sargent arrived in Baghdad on July 12, 2017, as one of two female SOC employees there.[1]  Am. Compl. ¶¶ 29–32, 34.  As a kennel master, Sargent had supervisory responsibilities over several K9 bomb detection teams.  *Id.* ¶ 33.  Immediately upon arrival, Sargent noticed that the male dog-handlers used inappropriate language, made frequent sexual comments, and catcalled female contractors on the compound.  *Id.* ¶¶ 38–40.  Sargent's supervisor at SOC, Kyle Lindsey, frequently assigned undesirable and dangerous duties to the two women.  *Id.* ¶¶ 41–43.

Two weeks after Sargent's arrival, Lindsey went on emergency leave and Sargent was elevated to the managerial role.  *Id.* ¶¶ 36–37.  Sargent and State Department employee Donnie Dolinger, who was responsible for supervising SOC's contract performance, *id.* ¶¶ 44–46, frequently disagreed about K9 operations; Dolinger often ordered the SOC teams to disregard State Department policies and procedures over Sargent's objection.  *Id.* ¶¶ 50–60.  Moreover, Dolinger engaged in constant sexual harassment, including lewd comments, leering, and invading Sargent's personal space.  *Id.* ¶¶ 61–78.  Other SOC personnel witnessed this behavior but did not intervene.  *Id.* ¶ 63.  Sargent was aware that Dolinger had a history of pressing female contractors for personal information, especially while out in the field on security duties.  *Id.* ¶¶ 136–42.

Lindsey returned from leave in August, demoted Sargent to her previous position, and elevated two male employees to supervisory roles in her place.  *Id.* ¶¶ 81–86.  Lindsey, Dolinger,

---

[1] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must, of course, accept well pleaded facts in the Complaint as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

and the other male employees were friends, and Sargent alleges that Lindsey made the changes in retaliation for her refusal to give into Dolinger's sexual advances during Lindsey's absence. *Id.* Lindsey later put Sargent and the other female employee on permanent desk duty, forbidding them to leave the administrative office during working hours while their male counterparts handled dogs in the field, attended meetings, and took excessive breaks. *Id.* ¶¶ 90–95. Sargent complained that she had no work to do in the office, but she remained on desk duty. *Id.* ¶¶ 96–97. Lindsey continued to assign field security work to Sargent on paper but informally replaced her with a man on each task and instructed her to remain inside. *Id.* ¶ 107.

On one occasion, Lindsey neglected to replace Sargent on a scheduled security check, so Sargent carried out the mission as assigned. *Id.* ¶ 108. Another dog handler, a veterinarian, and Dolinger accompanied her in a security vehicle. *Id.* ¶ 109. The task was to hide inert explosive material within the vehicle, drive through the Embassy's security checkpoints, and test the dogs' ability to detect the explosives. *Id.* ¶ 53. Dolinger and the other dog-handler engaged in a long, graphic conversation about pornography during the ride despite Sargent's visible discomfort with the discussion. *Id.* ¶¶ 110–18. They also encouraged her to make sexual advances toward the Embassy's Iraqi security guards. *Id.* ¶¶ 119–23. The experience of being in a confined space for several hours with male co-workers (including a supervisor) and discussing explicit material triggered traumatic memories of a prior sexual assault Sargent had experienced. *Id.* ¶¶ 124–30.

Later that day during a team meeting, Lindsey made comments to the group indicating that he wanted SOC employees to give Dolinger "whatever he wants to make him happy," which Sargent interpreted as encouragement to submit to Dolinger's sexual advances toward her. *Id.* ¶¶ 131–35. The same day, Sargent filed a complaint with SOC's president and its human

resources director in the United States.  *Id.* ¶ 143.  Sargent was on a plane home two days later

after accepting the company's offer to remove her from the situation.  *Id.* ¶ 144.

## II.    Procedural History

SOC promised to investigate the complaint and take corrective action.  *Id.* ¶ 145.

Although Dolinger was not an SOC employee, the human resources director told Sargent that

SOC would "take care of that[ a]nd that they will have the lawyers address it and notify the State

Department."  Pl.'s Mem. of P. & A. in Opp'n to Def's. Mot. to Dismiss ("Pl.'s Opp'n") at 8,

ECF No. 24 (emphasis removed).  Sargent indicated her desire to return to Baghdad once that

process was complete.  Am. Compl. ¶ 145.  Inexplicably, however, SOC cut off all contact with

Sargent.  *Id.* ¶¶ 146–47.

One month later on October 19, an SOC human resources official finally responded to

Sargent's inquiries and informed her that the company had terminated her employment because

the State Department had issued a "Loss of Confidence Letter," a formal censure that directed

SOC to remove Sargent from the contract and effectively barred Sargent from working on any

other State Department contract in the future.  *Id.* ¶¶ 148–49; *see also* Buford A. Pate's Ltr. of

Oct. 15, 2017 ("Loss of Confidence Ltr."), ECF No. 22-4.  According to the letter, Sargent had

stolen several items from another dog-handler's room at the Embassy while he was away on

leave and had encouraged other SOC employees to take items for themselves because the handler

"was not coming back."  Loss of Confidence Ltr. at 1.

On October 23, SOC admitted that it had never notified the State Department of

Sargent's sexual-harassment allegations against Dolinger and directed her to contact the State

Department's Inspector General (IG) if she wished to file a complaint herself.  Pl.'s Opp'n at 9.

Sargent filed an IG complaint on November 16 and then mailed supporting documentation on

November 20.  Pl.'s Opp'n at 9; *see also* Pl.'s Ltr. of Nov. 20, 2017, ECF No. 24-2.  The IG's

Office determined that it had no authority over the claims and informed Sargent that it would forward her complaint to the Office of Civil Rights, the organization responsible for fielding and investigating Equal Employment Opportunity (EEO) complaints.  *See* IG's Email of Jan. 8, 2018, ECF No. 24-3.  The IG's Office did investigate the Loss of Confidence Letter, determined that its allegations were unfounded, rescinded it, and reinstated Sargent's eligibility to work on State contracts.  *See generally* Jeffrey McDermott's Ltr. of Jun. 11, 2018, ECF No. 32-1.

Sargent waited several months for the Office of Civil Rights to contact her about its investigation, but she received no word.  Opp'n at 9.  Concerned with the long delay, Sargent mailed a copy of her IG complaint to the Office of Civil Rights on March 3, 2018.  *Id.*; *see also* State Department EEO Counselor's Report, ECF No. 22-5.  Sargent then discovered that the IG's Office had not actually forwarded her complaint, so she filed a formal complaint with the Office of Civil Rights on May 18, 2018.  *See generally* Pl.'s Formal EEO Complaint, ECF No. 22-7. That Office formally accepted Sargent's claims for investigation on July 27, 2018.  *See generally* Julie C. Smith's Ltr. of Jul. 27, 2018, ECF No. 24-5.  Sargent also filed a complaint against SOC with the EEOC on June 12, 2018.  Am. Compl. ¶ 13.  In addition to her administrative complaints of discrimination, Sargent filed a Notice of Claim Presented under the Federal Tort Claims Act with the State Department's Legal Advisor on August 14, 2018.  *Id.* ¶ 19.

Sargent filed this suit on March 6, 2019—before the Office of Civil Rights concluded its investigation.  *See generally* Compl., ECF No. 1.  In response, the Office of Civil Rights closed its investigation and provided Sargent with a copy of its findings to date.  Am. Compl. ¶ 17; *see also* Gloria D. Slater's Ltr. of May 30, 2019, ECF No. 25-1.  The Amended Complaint alleges three counts against both SOC and the State Department under Title VII:  (I) sex discrimination, Am. Compl. ¶¶ 163–72; (II) hostile work environment, *id.* ¶¶ 173–86; and (III) retaliation, *id.*

¶¶ 187–97.  In Count IV, Sargent brings a claim for intentional infliction of emotional distress against both Defendants under D.C. common law.  *Id.* ¶¶ 198–202.

SOC answered, ECF No. 16, but the State Department moved to dismiss, arguing that Sargent failed to exhaust administrative remedies and that the Amended Complaint fails to state a claim for relief.  *See generally* State's Mot.  Several months after that Motion became ripe, Sargent moved for leave to file a Second Amended Complaint to add a claim for whistleblower retaliation under the 2013 National Defense Authorization Act against only SOC.  *See generally* Pl.'s Mot. for Leave to File 2d Am. Compl.

### III.    Legal Standards

### A.    Motion to Dismiss

Ordinarily, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (internal quotation omitted).  Although the Court accepts all well pleaded facts in the Complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 554–55 (internal quotations and citations omitted).  The claim to relief must be "plausible on its face," enough to "nudge[ the] claims across the line from conceivable to plausible."  *Id.* at 570.  When assessing arguments that a plaintiff failed to exhaust administrative remedies in discrimination

cases, the Court may take notice of "administrative orders and . . . complaints" without converting the motion to dismiss into a motion for summary judgment under Federal Rule of Civil Procedure 12(d) "when no party disputes their authenticity." *Saintpreux v. Wolf*, No. 19-cv-01364, 2020 WL 1814400, at *4 (D.D.C. Apr. 9, 2020) (internal quotation omitted).

## B.     Motion for Leave to Amend

Sargent sought leave to amend her Complaint more than 21 days after SOC answered and the State Department moved to dismiss, so she may not amend as of right. *See* Fed. R. Civ. P. 15(a)(1)(B). Instead, she may amend "only with the opposing part[ies'] written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). SOC opposes amendment. *See generally* Def. SOC LLC's Mem. of P. & A. in Opp'n to Pl.'s Mot. for Leave to File 2d Am. Compl. ("SOC's Opp'n"), ECF No. 30. Although the "[C]ourt should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), justice does not *always* require the Court to grant leave to amend. "Leave may properly be denied if the proposed amendment is futile, such that it would not withstand a motion to dismiss." *Singletary v. Howard Univ.*, 939 F.3d 287, 295 (D.C. Cir. 2019) (internal quotations and citations omitted). The Court may also deny leave in the event of "undue delay, bad faith or dilatory motive on the part of [Plaintiff], . . . [or] undue prejudice to [Defendants]." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## IV.     Analysis

### A.  Motion to Dismiss

The State Department moves to dismiss the claims against it on three grounds. It first argues that Sargent failed to exhaust her administrative remedies. *See* State's Mot. at 8–11. Second, the State Department contends that Sargent was a contractor, not its employee, so she cannot sustain Title VII claims against it. *See id.* at 11–17. Finally, the State Department argues

that Sargent's common-law tort claim is preempted by Title VII and barred by the Federal Tort

Claims Act. *See id.* at 17–20.

### 1.    Administrative Exhaustion

Title VII plaintiffs must exhaust administrative remedies before suing the government.

42 U.S.C. § 2000e-16(c). "[I]t is part and parcel of the congressional design to vest in the federal

agencies and officials engaged in hiring and promoting personnel primary responsibility for

maintaining nondiscrimination in employment." *Kizas v. Webster*, 707 F.2d 524, 544 (D.C. Cir.

1983) (internal quotation omitted). "An aggrieved [Federal employee] must initiate contact with

[the agency's Equal Employment Opportunity] Counselor within 45 days of the date of the

matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1).

Sargent alleges a series of discriminatory actions and events that took place in the weeks

leading up to September 13, 2017. *See generally* Am. Compl. Under the regulation, she was

therefore required to contact a State Department counselor no later than October 28, 2017. *See*

*Roberts v. Scalia*, No. 19-cv-00474, 2020 WL 1892057, at *7 (D.D.C. Apr. 16, 2020) (discussing

reporting timeline for federal employees). Although Sargent filed an IG complaint on November

16, she did not contact the Office of Civil Rights until March 9, 2018—over five months past the

reporting deadline. Am. Compl. ¶ 16. State therefore argues that Sargent's claims against it

should be dismissed. *See* State's Mot. at 10 (citing *Johnson v. Gonzales*, 479 F. Supp. 2d 55, 59

(D.D.C. 2007) (dismissing for failure to exhaust)). Sargent concedes that her filing was late but

contends that the deadline should be equitably tolled and that the State Department waived this

issue by accepting Sargent's untimely complaint for investigation. *See* Pl.'s Opp'n at 7.

### a.    Equitable Tolling

Courts may "toll[] time limits in Title VII cases when complainants neither knew nor had

reason to know about the limit," *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997),

but courts "have typically extended equitable relief only sparingly," *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990).  "The court's equitable power to toll [a filing deadline] will be exercised only in extraordinary and carefully circumscribed instances."  *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579–80 (D.C. Cir. 1998) (internal quotation omitted).  Sargent "is entitled to equitable tolling only if she shows (1) that she has been pursuing her rights diligently, and (2) that some extraordinary circumstance stood in her way and prevented timely filing." *Dyson v. District of Columbia*, 710 F.3d 415, 421 (D.C. Cir. 2013) (internal quotation omitted). Such circumstances may include "where the claimant has actively pursued [her] . . . remedies by filing a defective pleading during the statutory period, or where complainant has been induced or tricked by [her] adversary's misconduct into allowing the filing deadline to pass."  *Irwin*, 498 U.S. at 96.

Sargent alleges that she relied on filing instructions from both SOC and the State Department's Office of the Inspector General, and that it was their fault that her complaint did not reach the Office of Civil Rights until March.  Pl.'s Opp'n at 8–10.  To be sure, SOC seems to have misled Sargent by assuring her that it would relay her complaints to the State Department and then directing her to the Inspector General rather than to the Office of Civil Rights.  *Id.* at 8. But Sargent cannot rely on SOC's allegedly false statements to toll the filing deadline *as to the State Department*.  "[E]quitable principles favor tolling where, for example, a defendant engaged in affirmative misconduct or misled a plaintiff about the running of a limitations period." *Washington v. WMATA*, 160 F.3d 750, 752–53 (D.C. Cir. 1998) (internal quotations omitted). The State Department had no notice of Dolinger's alleged misconduct until November 16, more than two months after the incident and nineteen days after Sargent's October 28 filing deadline had passed, so it had no opportunity to mislead Sargent.  *See* Pl.'s Opp'n at 9.

Moreover, Sargent learned on October 23—five days *before* the filing deadline—that SOC had not informed the State Department about her complaint.  *See id.*  To be sure, a five-day window in which to contact an Equal Employment Opportunity counselor is narrow, but it is more than enough time for a plaintiff who is "pursuing her rights diligently" to make initial contact.  *Dyson*, 710 F.3d at 421.  The fact that Sargent waited nearly four weeks after discovering SOC's failure to relay her concerns before she contacted *anyone* at the State Department indicates that equitable tolling is not appropriate in this instance.  And the Court need not consider whether Sargent's seemingly innocent mistake of contacting the Inspector General rather than the Office of Civil Rights or relying on representations made by personnel in the Office of the Inspector General that they would forward the complaint to the correct office merit equitable tolling, because those events took place weeks *after* Sargent missed the original deadline.  Sargent's reliance on those statements has no bearing on her failure to exhaust administrative remedies.[2]  *See Washington*, 160 F.3d at 753 (explaining that plaintiff could not have relied on agency's letter, even if it were misleading, because the letter arrived after the reporting deadline had passed).  Sargent is not eligible for equitable tolling.

---

[2] Beyond Dolinger's various actions occurring in Iraq, the Amended Complaint includes one more instance of alleged discrimination and retaliation as to the State Department:  the issuance of the Loss of Confidence Letter on October 15, 2017.  *See* Am. Compl. ¶¶ 172 (discrimination), 193 (hostile work environment), 197 (retaliation).  It is therefore conceivable that Sargent needed to contact a State Department counselor no later than November 29, 2017 as to that incident (although the earlier incidents would remain unexhausted, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)).  But Sargent does not make this argument.  And even if the Court were to treat a report to the Inspector General as one to the Office of Civil Rights for the purposes of equitable tolling, the Amended Complaint would fail to state a Title VII claim because Sargent admits that the State Department rescinded the letter during the course of its administrative investigation, effectively mooting the issue.  Am. Compl. ¶ 158.

b.      *Waiver*

Sargent next attempts to avoid dismissal by arguing that State waived its exhaustion defense when it accepted her claims for investigation.  *See* Pl.'s Opp'n at 11–12.  Sargent filed her formal complaint with the Office of Civil Rights on March 3, 2018.  *See generally* Pl.'s Formal EEO Complaint.  On July 27, the Office of Civil Rights notified Sargent that it had accepted her complaint for investigation and did not raise the timeliness issue.  *See* Smith's Ltr. of July 27, 2018.  That investigation was not yet complete the following year when the Office of Civil Rights closed the case because Sargent filed this suit.  Am. Compl. ¶ 17.  The Office handed over a copy of its investigation report but never rendered a Final Agency Decision.  *Id.*

Sargent argues that State's acceptance of the issues for investigation constitutes a waiver of any timeliness challenge.  Opp'n at 11–12.  She relies primarily on *Bowden*, in which the D.C. Circuit held that an agency waived the same issue.  *Id.* (citing 106 F.3d at 438).  But the *Bowden* decision states the rule plainly:  "Although agencies do not waive a defense of untimely exhaustion merely by accepting and investigating a discrimination complaint, we have suggested that if they not only accept and investigate a complaint, *but also decide it on the merits*—all without mentioning timeliness—their failure to raise the issue in the administrative process *may* lead to waiver of the defense when the complainant files suit."  106 F.3d at 438 (emphasis added) (internal citations omitted).  The Court there found waiver not only because the agency decided the complaint on the merits but also because it failed to raise timeliness during the administrative adjudication, at the outset in the district court, and in parallel litigation in the Court of Claims.  *Id.* at 439.

None of that is the case here.  The Office of Civil Rights never decided this case on the merits because Sargent sued before obtaining a Final Agency Decision, and it cannot be said that State therefore failed to raise timeliness during the administrative adjudication.  Am. Compl.

¶ 17; Def.'s Reply in Supp. of Mot. to Dismiss ("State's Reply") at 5, ECF No. 25; *see also*

*Guerra v. Cuomo*, 176 F.3d 547, 551–52 (D.C. Cir. 1999) (declining to reach an "an overly

expansive reading of *Bowden* . . . , inasmuch as [the agency] had not reached a final decision on

[Plaintiff's Equal Employment Opportunity] complaint when it asserted [its] defense."); *Bell v.

Donley*, 724 F. Supp. 2d 1, 10 (D.D.C. 2010) (declining to find waiver).  Moreover, the State

Department did present this defense at the outset of this litigation.  The State Department did not

waive its exhaustion defense.

### 2.    Employer-Employee Relationship

The State Department also argues that, even if Sargent had properly exhausted her

administrative remedies, she could not prevail against it under Title VII because she was not a

State Department employee.  State's Mot. at 11–14.  It is undisputed that SOC employed

Sargent.  Am. Compl. ¶ 30; State's Mot. at 11–12.  Sargent may, of course, bring claims against

SOC as her employer, but Title VII's federal employment section protects only federal

employees, not independent contractors or *their* employees.  42 U.S.C. § 2000e-16(a); *Spirides v.

Reinhardt*, 613 F.2d 826, 829–30 (D.C. Cir. 1979).  In certain circumstances, however,

individuals may be considered joint employees of both the contractor and government, and thus

have federal employment claims against the agency.  *Spirides*, 613 F.2d at 829–30.  "Status as an

employee is therefore of crucial significance for those seeking to redress alleged discriminatory

actions in federal employment."  *Id.*

The State Department first argues that the Amended Complaint's own description of

Sargent as a "contractor" constitutes an admission that she was not a State Department

employee.  Mot. at 11–12 (citing Am. Compl. at 1, ¶¶ 7, 8, 25).  It also points to her employment

contract with SOC, which clearly identifies her relationship with SOC (thereby implying that

Sargent was not simultaneously a State Department employee).  *Id.* at 12 (citing SOC

Employment Agreement, ECF No. 22-3).  The Complaint, however, expressly alleges joint employment.  Am. Compl. ¶¶ 7, 32, 164.  The State Department relies on decisions in which courts have dismissed contractors' Title VII claims against government agencies, but the plaintiffs in those cases made no attempts to allege joint employment.  *See* Mot. at 11 (citing *Palmer v. Napolitano*, 867 F. Supp. 2d 120, 123 (D.D.C. 2012); *Konah v. District of Columbia*, 815 F. Supp. 2d 61, 70 (D.D.C. 2011)).

To determine whether Sargent may have been a State Department employee for Title VII purposes—as in any question of whether an employment relationship exists—courts look to "the economic realities of the work relationship." *Spirides*, 613 F.2d at 831 (internal quotation omitted).  "This test calls for application of the general principles of the law of agency." *Id.* "[N]o one factor is determinative[, but] the extent of the employer's right to control the means and manner of the worker's performance is the most important factor to review." *Id.* (internal quotation omitted).  "If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* at 831–32.  The D.C. Circuit has identified eleven other factors courts may consider:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision;
>
> (2) the skill required in the particular occupation;
>
> (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work;
>
> (4) the length of time during which the individual has worked;
>
> (5) the method of payment, whether by time or by the job;

(6) the manner in which the work relationship is terminated; [i].e., by one or both parties, with or without notice and explanation;

(7) whether annual leave is afforded;

(8) whether the work is an integral part of the business of the "employer";

(9) whether the worker accumulates retirement benefits;

(10) whether the "employer" pays social security taxes; and

(11) the intention of the parties.

*Id.* at 832.[3]  The Court of Appeals later grouped those factors into four categories in an attempt to simplify the analysis:  the "intent of the parties, 'whether contracting out work is justifiable as a prudent business decision,' the client's control over the work, and 'whether the relationship shares attributes commonly found in arrangements with independent contractors or with employees.'"  *Palmer*, 867 F. Supp. 2d at 124 (quoting *Redd v. Summers*, 232 F.3d 933, 939–40 (D.C. Cir. 2000)).

Sargent focuses her argument on the degree to which the State Department exerted control over her daily duties at the Embassy.  Pl.'s Opp'n at 13–14.  The Amended Complaint names only one State Department employee who played a role:  Donnie Dolinger.  Sargent

---

[3] It is unclear whether *Spirides* controls here.  The D.C. Circuit has noted that *Spirides* addressed whether plaintiff was an employee or an independent contractor, but it did not consider whether he might be both.  *Redd v. Summers*, 232 F.3d 933, 938 (D.C. Cir. 2000).  The *Redd* Court pointed at a Third Circuit test it thought might be more appropriate in the context of joint employment.  *Id.* (quoting *NLRB v. Browning-Ferris Indus. of Penn., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982) ("whether 'one employer[,] while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.'")).  The Parties in *Redd*, however, both argued that *Spirides* governed, so the Court applied that test.  *Id.*; *see also Al-Saffy v. Vilsack*, 827 F.3d 85, 96–97 (D.C. Cir. 2016) (recognizing the two tests but holding that both standards compelled the same result in that case).  Here, the State Department argues that *Spirides* governs and Sargent does not contest that argument, so the Court applies it.

alleges that "[i]n his role as the Government Technical Monitor, Dolinger was responsible for making sure SOC was meeting its requirements under the State Department contract" and was "assigned to oversee the K9 Operations Program."  Am. Compl. ¶ 45.  Beyond concluding that "Dolinger exercised a great deal of control over Sargent's employment," *id.* ¶ 46, the Complaint alleges that "Dolinger assigned a variety of administrative tasks to Sargent, from obtaining vehicles to picking up cleaning supplies or dog food," *id.* ¶ 47; that Dolinger ordered Sargent to procure vehicles for him from the motor pool, accompanied her on many of her security checks, gave her feedback about her performance, and gave instructions about how to conduct the checks (often contradicting established procedures), *id.* ¶¶ 48–52; and that he determined what shifts she worked and approved her requests for new equipment (sometimes ordering Sargent to purchase specific brands), *id.* ¶¶ 57–59.

State points at other allegations that seem to minimize its control over Sargent and place intermediaries between her and Dolinger.  State's Mot. at 13–14.  State notes the Complaint's allegations that, for other than a few weeks when Lindsey was on leave, it was Lindsey (an SOC employee), not Dolinger, who directed Sargent's activities.  *Id*.  State also points to other *Spirides* factors, arguing that Sargent (1) was a specialist (2) with special training and experience in her field; (3) that SOC, not State, furnished the dogs; (4) that Sargent was recruited by SOC and only deployed to Iraq for three months; (5) that SOC controlled her pay; and (6) that it was SOC, not State, that terminated her employment.  *Id.* at 15.  State also argues that (8) dog handling is not an integral function of the State Department and (11) that all official documents (the State-SOC contract and the SOC-Sargent employment agreement) point to a contractor relationship.  *Id.* at 16.  Moreover, beyond any individual factor, State argues that Sargent never complained to any State official about the alleged discrimination—she went to SOC and relied

on SOC's assurances that it would take the matter up with State.  *Id.*  It was SOC, in turn, who

removed Sargent from Iraq (with her consent) and later terminated her.  *Id.*

Sargent argues that this entire line of inquiry is premature and should be delayed until

summary judgment.  Pl.'s Opp'n at 13–14.  She cites several non-Title VII cases for the

proposition that "the ultimate determination of whether an entity is a joint employer must be

based upon the circumstances of the whole activity" and "is essentially a fact issue."  *Harris v.*

*Med. Transp. Mgmt., Inc.*, 300 F. Supp. 3d 234, 243 (D.D.C. 2018) (internal quotations omitted).

In Sargent's view, her burden at this stage is "feather light;"  she need only allege *some* facts

supporting the inference that the State Department controlled her employment to survive the

Motion to Dismiss.  Pl.'s Opp'n at 13–14.  She has a point; many of the cases the State

Department cites involved either dismissal for a failure to allege joint employment at all, *see,*

*e.g.*, State's Reply at 5 (citing *Palmer*, 867 F. Supp. 2d 120), or resolution on summary

judgment, *see id.* at 7 (citing *Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 113–14 (D.D.C. 2015)

(granting summary judgment to defendant on the question of joint employment)).[4]

The State Department responds that the claims in *Harris* arose under the Fair Labor

Standards Act (FLSA), not Title VII, and that FLSA's definition of "employer" is expansive,

whereas Title VII's is minimal.  State's Reply at 7 (citing *Harris*, 300 F. Supp. 3d at 240).  The

Court need not wade into that debate, however, because whatever Sargent's burden at this early

stage, she has not met it.  Taking all of the Amended Complaint's allegations as true and drawing

---

[4] The State Department's Reply also cites *Mason v. African Development Foundation*, 355 F.
Supp. 2d 85 (D.D.C. 2004), in which the Court granted a motion to dismiss after finding that
there was no joint employment.  *See* State's Reply at 8.  That case seems to have been abrogated
in part because it incorrectly treated the joint-employment inquiry as jurisdictional and therefore
decided it was necessary to address at the outset.  *See Harris v. Att'y General*, 657 F. Supp. 2d 1,
8 (D.D.C. 2009) (recognizing *Mason's* abrogation and declining to grant summary judgment
because of material fact issues).

all reasonable inferences in Sargent's favor, *Holy Land Found. for Relief & Dev.*, 333 F.3d at

165, Sargent has failed adequately to allege she was a State Department employee.

Under *Spirides*, courts look in part to "the manner in which the work relationship is

terminated" to evaluate whether a defendant employed a plaintiff.  613 F.2d at 832.  Sargent's

behavior at the end of her tour comports completely with her status as an employee of SOC and

is entirely inconsistent with her claim that the State Department employed her.  After the final

incident of sexual harassment occurred on September 13, 2017, Sargent "drafted and sent an

urgent complaint to SOC's President and Human Resources Director, reporting the extreme

sexual harassment and discrimination she was suffering."  Am. Compl. ¶ 143.  She then

"accepted SOC's offer to remove her from Baghdad[] and . . . returned to the United States."  *Id.*

¶ 144.  There is no indication that Sargent notified any State Department employee at the

Embassy of either the alleged sexual harassment or Sargent's intention to leave Iraq and return to

the United States.  Sargent then relied on SOC's promise "that it would investigate her complaint

fully," *id.* ¶ 145, and its assurance that SOC would relay Sargent's allegations against Dolinger

to the State Department and "take care of that," Pl.'s Opp'n at 8 (quoting Pl.'s Ltr. of Nov. 20,

2017).  It was only *after* Sargent discovered that SOC had failed to address her concerns with the

State Department that she contacted the Inspector General (to whom SOC personnel directed

her).  Am. Compl. ¶ 158; Pl.'s Opp'n at 9.  In each instance, Sargent relied on SOC to serve as

the intermediary between her and the State Department.  Those allegations are entirely consistent

with her status as an employee of a contractor, and it would be unreasonable to infer from these

allegations that Sargent was (or considered herself to be) a State Department employee.  *See*

*Spirides*, 613 F.2d at 832 (directing courts to evaluate "the intention of the parties").

17

Sargent's state of mind also helps to explain her difficulty with exhausting administrative remedies. *See* State's Reply at 7–8. Sargent admittedly relied on SOC to relay her sexual-harassment allegations to the State Department, and also did not understand the State Department's reporting requirements or the offices charged with accepting Equal Employment Opportunity complaints. *See* Pl.'s Opp'n at 8–9 ("SOC promised Sargent that the company would forward her complaint of sexual harassment and hostile work environment to State —but SOC failed to do so. . . . SOC told Sargent that the proper office within State for her to file a complaint was [the Office of the Inspector General] and Sargent relied on that instruction."). Those allegations fail to support a reasonable inference that Sargent was a State Department employee. Although Sargent describes this convoluted chain of events as "a comedy of errors," *id.* at 9, her allegations instead compel the inference that she was not a State Department employee, that she did not fit into or understand the Department's guidelines for reporting discrimination, and that she could not legally file a Title VII complaint against the Department.

The State Department's arguments that Sargent failed to exhaust administrative remedies and that she is ineligible to pursue a Title VII claim against it both serve as both independent grounds for dismissal, but the two arguments reinforce each other and show that Sargent's "beef lies with" SOC, not with the State Department. *Palmer*, 867 F. Supp. 2d at 125. Sargent's Title VII claims against the State Department must be dismissed.

### 3.    Tort Claim

Unlike the other counts, Count IV does not arise under Title VII. Instead, Sargent alleges that both SOC and the State Department intentionally inflicted emotional distress upon her under D.C. common law. Am. Compl. ¶¶ 198–202. She alleges that she and Defendants had a special relationship because "Defendants were responsible for [her] physical safety and security in Baghdad" and that her supervisors "had the authority to regularly make life or death decisions

18

for [her]." *Id.* ¶ 200.  By issuing Sargent a Loss of Confidence letter after she left to escape

pervasive sexual harassment, she alleges, the State Department "effectively end[ed] her career as

a U.S. Government contractor [] in retaliation for [her] complaints of severe sexual

harassment."[5] *Id.* ¶ 201.

The State Department moves to dismiss Count IV on two grounds.  It first argues that

Title VII is an exclusive remedy for discrimination claims and cannot be combined with other

causes of action covering the same conduct.  State's Mot. at 17 (citing *Brown v. GSA*, 425 U.S.

820 (1976) ("[Title VII] provides the exclusive judicial remedy for claims of discrimination in

federal employment.")).  Sargent responds that she pleads Count IV in the alternative on the

assumption that may she not properly have a Title VII claim.  Pl.'s Opp'n at 16.  Because the

Court dismisses Sargent's Title VII claims, *see supra* sections IV.A.1–2, the State Department's

first argument is no longer relevant.

The State Department next argues that the Federal Tort Claims Act bars the claim.

State's Mot. at 17–20 (citing 28 U.S.C. § 2680).  "The FTCA was designed primarily to remove

the sovereign immunity of the United States from suits in tort."  *Millbrook v. United States*, 569

U.S. 50, 52 (2013) (internal quotation omitted).  "This broad waiver of sovereign immunity is

subject to a number of exceptions set forth in § 2680."  *Id.*  The FTCA does not expressly bar

---

[5] It is unclear how Sargent could plausibly allege that the State Department committed any intentional tort in retaliation for her exercise of protected activity because the timelines do not permit the inference.  The State Department issued its Loss of Confidence Letter on October 15, 2017.  *See generally* Loss of Confidence Ltr.  Sargent did not file her complaint with the Inspector General, however, until November 16, 2017.  *See generally* Pl.'s Ltr. of Nov. 20, 2017.  It is therefore implausible that Sargent's complaint caused the State Department to issue the Loss of Confidence Letter.  *See King v. Holder*, 77 F. Supp. 3d 146, 154–55 (D.D.C. 2015) (Since Plaintiff's protected activity occurred after [his supervisor initiated an IG investigation of Plaintiff], it is implausible for the . . . investigation to have been initiated in retaliation for Plaintiff's protected activity.")  The State Department does not make this argument, however, so the Court does not further address it.

claims for intentional infliction of emotional distress.  *See Armstrong v. Geithner*, 610 F. Supp. 2d 66, 71 (D.D.C. 2009) (citing 28 U.S.C. § 2680).  The State Department contends, however, that the Court should look through the label Sargent has attached to her allegations and construe the claim as one either for slander, abuse of process, or intentional interference with contract—each of which the Act does expressly bar.  State's Mot. at 19 (citing *Koch v. United States*, 209 F. Supp. 2d 89, 94 (D.D.C.), *aff'd* No. 02-5222, 2002 WL 31926832 (D.C. Cir. 2002) ("[T]he Court must examine the actual conduct upon which plaintiff [] bases his claim for intentional infliction of emotional distress. . . .  If the alleged conduct constitutes a tort listed in § 2680, then this Court has no jurisdiction to hear the claim of intentional infliction of emotional distress.").  The State Department points out that Sargent's core allegations are that it caused SOC to fire her and prevented her from obtaining future employment as a contractor in retaliation for her engaging in protected activity by reporting the sexual harassment.  State's Mot. at 19; State's Reply at 8–9.  That conduct, State argues, has little to do with infliction of emotional distress and more to do with interference with Sargent's ability to continue performing her contract with SOC or to find new work with another contractor.  *Id.*

"The elements of [intentional infliction of emotional distress] are '(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Smith v. United States*, 843 F.3d 509, 515 (D.C. Cir. 2016) (quoting *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008)).  "To qualify as sufficiently extreme and outrageous, the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Smith v. Clinton*, 253 F. Supp. 3d 222, 243 (D.D.C. 2017) (quoting *Armstrong v. Thompson*, 80 A.3d 177, 189 (D.C. 2013)).  It is

certainly questionable whether Sargent's allegations are severe enough to fit within the tort's scope under D.C. law.

In her Response brief, however, Sargent disavows any theory of liability related to her contract with SOC and instead tries to recast her allegations as ones for intentionally providing false reports of misbehavior to government authorities, an action the D.C. Court of Appeals has recognized may constitute intentional infliction of emotional distress.  *See* Pl.'s Opp'n at 16–17 (citing *Carter v. Hahn*, 821 A.2d 890, 895 (D.C. 2003)).  There are two problems with this argument.  First, the State Department *is* the authority that received the false report, so it is unclear how the Department itself could be liable for such conduct.  Second, the Amended Complaint makes no such allegations; it alleges that the State Department "issued or caused to be issued a Loss of Confidence letter to Sargent—[]*effectively ending her career as a U.S. Government contractor*."  Am. Compl. ¶ 201 (emphasis added).  That allegation is consistent with a claim for "interference with contract rights," a claim which the FTCA expressly bars.  28 U.S.C. § 2680(h).  The Court must dismiss Sargent's tort claim against the State Department. Because Sargent's Title VII claims against the State Department also fail, the Court dismisses the State Department from this case.[6]

### B.      Motion for Leave to Amend

Six months after briefing concluded on the State Department's Motion to Dismiss, Sargent moved for leave to amend her Complaint to add a fifth count against SOC alone: whistleblower retaliation under the 2013 National Defense Authorization Act (NDAA), 41

---

[6] The Court does not address the State Department's argument that the FTCA's foreign-country exception bars this claim, *see* Mot. at 20, because the State Department appears to have abandoned the argument by failing to respond to Sargent's counterarguments in its Reply brief. *See* Pl.'s Opp'n at 16–17.

U.S.C. § 4712.  *See generally* Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Leave to File 2d

Am. Compl. ("Pl.'s Mot."), ECF No. 27-1.  The statute protects employees of government

contractors who report misconduct related to federal contracts.  *See* 41 U.S.C. § 4712(a)(1).  An

employee who files such a report and who then experiences retaliation may, after exhausting

administrative remedies, sue the contractor.  *Id.* § 4712(c)(2).  The proposed Second Amended

Complaint adds a few factual paragraphs relating to exhaustion[7] and then alleges in Count V that

Sargent reported both Dolinger's harassment and Lindsey's encouragement to submit to that

harassment to SOC's president and that SOC subsequently fired her.  Proposed 2d Am. Compl.

¶¶ 209–32, ECF No. 27-2.  In turn, SOC argues that the proposed new claim is barred by the

statute of limitations, that it fails to state a claim under the NDAA, and that Plaintiff waited too

long to raise the claim in this litigation.  *See generally* SOC's Opp'n.

      Before reaching the Parties' substantive argument, the Court must first address a few

procedural items that arose in the course of briefing.  Under *Foman*, the Court may deny leave to

amend if the proposed amended complaint would not survive a motion to dismiss.  *See* 371 U.S.

at 182.  Any time a defendant opposes granting a plaintiff leave to amend her complaint on

futility grounds, the opposition essentially functions like a motion to dismiss the proposed

amendments.  Applying the futility standard before granting leave to amend conserves resources

by condensing the application of both Rule 15's liberal amendment standard and Rule 12's

---

[7] In addition to the allegations contained in Count V and the exhaustion information, the Proposed Second Amended Complaint contains a new paragraph alleging that SOC provided false information about Sargent to the State Department and thereby caused the State Department to issue the Loss of Confidence Letter.  *See* Proposed 2d Am. Compl. ¶ 166.  That allegation may bear on the Court's analysis of the other counts against SOC later in this litigation.  SOC does not challenge that allegation, so even though the Court denies leave to add the new count, it grants Sargent leave to amend to add ¶ 166.

standards for dismissing faulty pleadings into a single set of briefing before the amendment goes into effect. *See* Fed. Rs. Civ. P. 15(a)(2); 12(b).

Sargent takes issue with that process here. She argues that, rather than applying *Foman's* futility standard in the context of her Motion for Leave to Amend, the Court should instead permit amendment and then allow SOC to move to dismiss the new allegations under Rule 12. *See* Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Leave to File 2d Am. Compl. ("Pl.'s Reply") at 6 & n.2, ECF No. 32. On the contrary, courts regularly decide whether a proposed amendment is futile within the context of a motion for leave to amend. *See, e.g.*, *Ward-Johnson v. Glin*, No. 19-cv-00534, 2020 WL 2770018, at *10–11 (D.D.C. May 28, 2020) (granting in part and denying it part defendant's motion to dismiss and denying leave to amend on futility grounds).

Sargent does, however, have a point. Because it is Sargent who moves for leave to amend, SOC has only one opportunity (in its Opposition brief) to present its arguments as to why the new material in the proposed amendment fails to state a claim. *See generally* SOC's Opp'n. If the Court were to follow Sargent's suggestion, permit amendment, and then allow SOC to move to dismiss, then SOC would have two chances to make its arguments (in its motion and then again in its reply brief). In most cases, defendants may not need the extra opportunity to flesh out their arguments. Here, however, the difference matters. As explained in more detail below, SOC argues in its Opposition that Sargent's proposed Count V is barred by the statute of limitations. *See* SOC's Opp'n at 7; *infra* Section IV.B.1. Sargent responds in her Reply that her amendment relates back to her original filing. *See* Pl.'s Reply at 5–6. In turn, SOC sought leave to file a Surreply on that narrow issue. *See* Def. SOC LLC's Mot. for Leave to File a Sur-reply in Opp'n to Pl.'s Mot. for Leave to File 2d Am. Compl., ECF No. 33.

Although surreplies "are generally disfavored," Pl.'s Opp'n to Def. SOC LLC's Mot. for Leave to File a Sur-Reply in Opp'n to Pl.'s Mot. for Leave to File 2d Am. Compl. at 1, ECF No. 34 (citing *Kifaft v. Hilton Hotels Ret. Plan*, 736 F. Supp. 2d 64, 69 (D.D.C. 2010)), "[t]he decision to grant or deny leave to file a surreply is committed to the sound discretion of the Court," *Lu v. Lezell*, 45 F. Supp. 3d 86, 91 (D.D.C. 2014). The Court could have permitted amendment at the outset and then allowed SOC to move to dismiss, as Sargent suggested. If the Court had taken that approach, then SOC would have raised the limitations issue in its own motion, Sargent would have argued relation back in her opposition, and SOC would have attempted to counter Sargent's argument in its Reply. Rather than extending the litigation of these questions and ordering an entire new round of briefing on the same topics in the context of a motion to dismiss, the Court concludes that allowing SOC to file a Surreply would effectively mirror Sargent's suggested process, give both Parties ample opportunity to make their arguments, and give the Court the benefit of fully developed briefing on the pertinent issues. In the interest of judicial economy, the Court therefore grants SOC leave to file a Surreply and deems its proposed Surreply, ECF No. 34-1, filed.

### 1.     Statute of Limitations

Under the statute, "a[ civil] action . . . may not be brought more than two years after the date on which remedies are deemed to have been exhausted." 41 U.S.C. § 4712(c)(2). The Office of the Inspector General closed its investigation and denied Sargent's complaint on June 11, 2018. *See generally* McDermott's Ltr. The Parties agree that Sargent exhausted administrative remedies under § 4712(c)(2) on that date. *See* SOC's Opp'n at 9; Pl.'s Reply at 5. Sargent filed her original Complaint on March 6, 2019, less than one year after the IG denied Sargent's NDAA complaint. *See generally* Compl. That Complaint, however, contained no mention of an NDAA claim. *See generally id.* Sargent's Amended Complaint likewise brought

24

no NDAA claim.  *See generally* Am. Compl.  It was not until June 12, 2020—two years and one

day after Sargent exhausted her remedies—that Sargent moved for leave to amend to add the

NDAA claim.  *See* Proposed 2d Am. Compl. ¶¶ 209–32.

      "[A]n amendment adding a new ground for relief to the complaint must contend with the

applicable statute of limitations."  *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009).

SOC's argues that because the claim accrued on June 11, 2018, Sargent had until June 11, 2020,

to raise it, and because she moved for leave to amend on June 12, 2020, she was one day too late.

SOC's Opp'n at 7.  Sargent responds that under Federal Rule of Civil Procedure 6, the two-year

time period "exclude[s] the day of the event that triggers the period" and "include[s] the last day

of the period."  Fed. R. Civ. P. 6(a)(1)(A), (C).  Because the IG's letter was dated June 11, she

contends that the claim accrued on June 12, 2018, and therefore her June 12, 2020 filing was

timely.  *See* Pl.'s Reply at 5.

      Sargent's calculations are incorrect.  Under Rule 6, even though the claim accrued on

June 11, 2018, the Court excludes that date from the calculation—it is "Day 0."  Fed. R. Civ. P.

6(a)(1)(A).  June 12, 2018, was therefore "Day 1," so June 11, 2019, was "Day 365"—the last

day of the first year under the statute of limitations.  *Id.*  The calculation continued into the

second year, such that June 12, 2019, was "Day 1" of the second year and June 11, 2020, (a leap

year) was "Day 366"—the last day of the second year and therefore the last date on which

Sargent could file her NDAA claim.  Fed. R. Civ. P. 6(a)(1)(C).  June 12, 2020, was the first day

of the third year and therefore outside the NDAA's required filing period.  *Id.*

      The Court has found a few decisions applying Rule 6 in the manner Sargent suggests.

*See, e.g.*, *Paynter v. Chesapeake and O. Ry.*, 60 F.R.D. 153, 157 (W.D. Va. 1973); *Rodriguez v.*

*United States*, 382 F. Supp. 1, 2 (D.P.R. 1974).  Most decisions, however, reject that method and

accord with SOC's argument.  *See, e.g.*, *Merriweather v. City of Memphis*, 107 F.3d 396, 398–99 (6th Cir. 1997) (affirming dismissal of § 1983 claim filed one day too late); *Randolph v. TVA*, 792 F. Supp. 1221, 1223 (N.D. Ala. 1992) (dismissing tort suit filed one day too late); *McDuffee v. United States*, 769 F.2d 492, 494 (8th Cir. 1985) (interpreting the FTCA's limitations period); *see also United States v. Inn Foods, Inc.*, 383 F.3d 1319, 1324 (Fed. Cir. 2004) (collecting appellate cases applying Rule 6 to habeas claims under the Antiterrorism and Effective Death Penalty Act's one-year statute of limitations).  Under the majority rule, which the Court adopts, Sargent filed her NDAA claim one day after the limitations period expired.  Her claim is therefore time-barred.  *See Reed v. Keypoint Gov't Solutions*, No. 19-cv-01230, 2020 WL 4199726, at *2–3 (D. Colo. Jul. 22, 2020) (dismissing § 4712 claim for failure to comply with the statute of limitations).

### a.  *Relation Back*

But "[i]n limited circumstances, Rule 15(c) saves an otherwise untimely amendment by deeming it to 'relate back' to the timely-filed claims the plaintiff alleged in the original complaint."  *Jones*, 557 F.3d at 674 (quoting Fed. R. Civ. P. 15(c)).  "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out— in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  "[R]elation back is improper when the amended claim 'asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'"  *Jones*, 557 F.3d at 674 (quoting *Mayle v. Felix*, 545 U.S. 644, 650 (2005)).  Sargent contends that her proposed Complaint adds no new facts; it merely adds a new theory of liability that covers essentially the same conduct she pleaded as retaliatory conduct under Title VII.  *See* Pl.'s Reply at 5–6.  There's no reason, she argues, that SOC should be "surprised by the amplification of the allegations of the original complaint in the

26

amended one." *Id.* at 6 (quoting *Dave v. District of Columbia*, 811 F. Supp. 2d 111, 117 (D.D.C. 2011)).

SOC responds that the new claim alleges fundamentally different misconduct than the Title VII retaliation claim describes. *See* SOC's Surreply at 4–5. SOC contrasts *Dave* (the only case Sargent cites) with *Golden v. Mgmt. & Training Corp.*, 266 F. Supp. 3d 277 (D.D.C. 2017) ("*Golden I*") and 319 F. Supp. 3d 358 (D.D.C. 2018) ("*Golden II*"). In *Dave*, a police cadet brought Title VII discrimination and retaliation claims against the city. 811 F. Supp. 2d at 114. While discovery was in progress, Dave moved for leave to amend to add § 1981 discrimination and retaliation claims and a due-process claim for terminating him improperly. *Id.* at 115. The Court held that the new claims related back to the earlier filing because Dave added no new facts but merely asserted various other theories of liability for the same injury. *Id.* at 116–17.

Similarly, in *Golden I*, the plaintiff had initially brought age-discrimination and hostile-work environment claims under Title VII. 266 F. Supp. 3d at 279. Defendants moved to dismiss because Title VII does not prohibit age discrimination, and the Court subsequently permitted Golden to substitute claims under the Age Discrimination in Employment Act (ADEA). *Id.* at 280. Defendants then moved to dismiss again because the First Amended Complaint named the wrong company—it mistook a parent company for a holding company. *Id.* at 282. In response, Golden sought leave to amend to name the proper defendant. *Id.* at 282. The new defendant argued that the ADEA retaliation claim against it was time-barred, but the Court held that the ADEA claim related back to the original allegations under Title VII because the amendment "simply change[d] the formal legal basis for the relief that Golden [sought]." *Id.* at 283 (citing *Dave*, 811 F. Supp. 2d at 117). Although it found that the ADEA retaliation claim was not time-

barred, the Court nevertheless dismissed for failure to state a claim and invited Golden to amend once again to supplement his facts.  *Id.* at 287.

Golden did so, but in the course of adding factual allegations to support his claim that he had been fired in retaliation for engaging in ADEA-protected activity, he also newly claimed that the same termination constituted ADEA discrimination.  *Golden II*, 319 F. Supp. 3d at 383. The Court held that the amendment was untimely because, "[w]hile [Golden's] allegedly discriminatory termination certainly occurred at the same 'time' as his alleged retaliatory termination, the harm he suffered [was] not of the same 'type.'"  *Id.* at 384 (internal citations omitted).  Distinguishing *Dave*, where the new claims "stated no new factual allegations," *id.* (citing *Dave*, 811 F. Supp. 2d at 116–17), the Court noted that Golden had added "a new set of factual allegations to support his new . . . claim," *id.*  In particular, Golden had never before alleged that his employer had terminated him because of his age, whether in earlier versions of his complaint or in his administrative processes with the EEOC, even though he had alleged other instances of age discrimination throughout the course of litigation.  *Id.*  The Court concluded that the claim, though similar to other Golden's other allegations, was untimely and did not relate back.  *Id.*

Sargent's attempt to construe her NDAA-retaliation claim as merely an additional theory of liability for the conduct she has already alleged in her Title VII retaliation claim, *see* Pl.'s Reply at 6–7, ignores new factual allegations contained in her proposed Second Amended Complaint.  In Count III of her Amended Complaint, Sargent alleges that she made a protected complaint to SOC, Am. Compl. ¶ 192; that SOC promised but failed to investigate the complaint, *id.* ¶ 196; and that it terminated Sargent's employment about one month later, *id.* ¶¶ 193–94, 197—standard fare for Title VII retaliation claims.  Sargent's Proposed Second Amended

Complaint contains the same allegations in Count III.  Proposed 2d. Am. Compl. ¶¶ 193–203.

The new Count V, however, goes well beyond the previous allegations.  In it, Sargent alleges not

only that SOC terminated her in retaliation for her protected activity but that she "warned the

President of SOC and its Human Resources staff that SOC's actions on the . . . contract were

illegal, which in turn ma[de] any claims for payment on such a contract a fraud on the taxpayer."

*Id.* ¶ 212.  She goes on to allege that "SOC conspired with the State Department's Government

Technical Monitor, Dolinger, to permit him to control[, ]abuse and harass female employees and

contractors," and to "provide him the means and opportunity to have special power over female

employees under his supervision so as to help Dolinger gratify his sexual desires and his desires

to abuse women."  *Id.* ¶¶ 223, 225.  And Sargent alleges that Dolinger "conspired with SOC to

ensure SOC would . . . remain on the State Department contract" and "be awarded future State

Department contracts."  *Id.* ¶¶ 224, 226.

Those allegations are noticeably absent from Sargent's earlier Complaints and accuse

SOC of much more serious misconduct than anything contemplated in previous filings.  The

Proposed Second Amended Complaint "asserts a new ground for relief supported by facts that

differ in both time and type from those the original pleading set forth," *Jones*, 557 F.3d at 674,

and therefore does not relate back to Sargent's earlier Complaint.  The Court therefore denies

leave to amend as untimely.

### 2.      Failure to State a Claim

SOC also contends that, even if the proposed amendment had been timely, Count V

would fail to state a claim for relief.  SOC's Opp'n at 9–16.  To state a § 4712 claim, Sargent

must plausibly allege "that (1) she was an employee of a government contractor, (2) she

disclosed information that she reasonably believed was evidence of a rule violation related to a

federal contract to the required person, and (3) her disclosure was a contributing factor in the

action taken against her." *Armstrong v. Arcanum Grp. Inc.*, No. 16-CV-1015, 2017 WL 4236315, at *7 (D. Colo. Sept. 25, 2017).  SOC attacks only the second prong, arguing that the alleged misconduct was not "evidence of a rule violation related to a federal contract" and that Sargent could not have reasonably believed otherwise.  *See* SOC's Opp'n at 10–11 (citing *Ficarra v. SourceAmerica*, No. 19-cv-01025, 2020 WL 1606396 (E.D. Va. Apr. 1, 2020) (dismissing NDAA claim against government contractor for alleged misconduct related to its non-governmental contracts)).

   As noted above, the Proposed Second Amended Complaint alleges that "Sargent warned the President of SOC . . . that SOC's actions on the . . . contract were illegal, which in turn makes any claims for payment on such a contract a fraud on the taxpayer, based on false certifications that go with such claims for payments."  Proposed 2d Am. Compl. ¶ 212.  The illegal conduct to which Sargent points was alleged collusion between a State Department employee and SOC employees to sexually harass female SOC employees.  *Id.* ¶¶ 213–18, 223–27.  Specifically, Sargent alleges that "SOC conspired with Dolinger to provide him the means and opportunity to have special power over female employees . . . so as to help Dolinger gratify his sexual desires and his desires to abuse women" and that, in return, "Dolinger conspired with SOC to ensure SOC would be awarded future State Department contracts."  *Id.* ¶ 225–26.

   SOC makes three arguments in response.  First, it contends that the alleged misconduct here is of a different type than the examples the statute gives.  *See* SOC's Opp'n at 12.  The statute punishes reprisal against employees who report

> evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1).  SOC argues that those activities contain "an actual nexus" between the alleged misconduct and the contract, *see* SOC's Opp'n at 13, while here Sargent reported misconduct by individual employees that was attenuated from the contract itself; there is no allegation that SOC failed to provide security, overcharged the government, or procured the contract through underhanded means.  Sargent's proposed allegations of conspiracy hint at that nexus, *see* Proposed 2d Am. Compl. ¶¶ 225–26, but they appear to be conclusory allegations that cannot, on their own, support a claim for relief, *Twombly*, 550 U.S. at 555.

Second, SOC argues that Title VII alone cannot serve as the "law, rule or regulation related to a Federal contract" for which reports of a violation trigger § 4712's protections because it is generally applicable to all employers, regardless of whether they engage in government contracting.  *See* SOC's Opp'n at 13–15.  To allow the claim to go forward, SOC contends, would sweep any allegations of illegal activity by a government contractor within the scope of § 4712.  *Id.*  Likewise, SOC contends that the alleged misconduct cannot serve as an "abuse of authority" under the statute because the NDAA defines that term as "an arbitrary and capricious exercise of authority that is inconsistent with the mission of the executive agency concerned or the successful performance of a contract or grant of such agency."  41 U.S.C. § 4712(g)(1).  That language again requires a nexus with the contract, which is lacking in Sargent's new allegations.

Third, SOC points to the administrative framework that exists to handle Title VII complaints and the strict deadlines claimants must meet to sue their employers.  SOC's Opp'n at 15.  Section 4712 has fewer exhaustion requirements, does not involve the EEOC, and permits suits up to two years after exhaustion.  *Id.*  Plaintiffs who miss the Title VII deadlines could

simply sidestep that process if any Title VII complaint against a government contractor also stated a § 4712 claim. *Id.*

Sargent responds to these arguments by urging a broad understanding of the phrase "related to a Federal contract." *See* Pl.'s Reply at 7. In Sargent's view, her "NDAA claim indeed relates to a government contract in the sense that . . . she worked in Iraq on a Federal contract . . . and was paid with government monies." *Id.* She also contends that Dolinger's actions constitute an "abuse of authority" because "Dolinger was in a position of unique authority over Sargent" and was therefore "engaging in an abuse of power through his sexual harassment and discriminatory conduct." *Id.* She cites no cases supporting her expansive view.

The Court was unable to locate any decision applying § 4712 to allegations of employment discrimination. The closest analogue appears to be *United States ex rel Talbot v. National Railroad Passenger Corp.*, a case in which a disabled whistleblower brought claims under the False Claims Act and the NDAA and also alleged disability discrimination, retaliation, and hostile-work environment under the D.C. Human Rights Act. No. 17-cv-1997, 2020 WL 1170550 (D.D.C. Mar. 11, 2020). There, Talbot formed a "belief that Amtrak was misusing and misappropriating federal funds earmarked for ADA projects" and "made several disclosures concerning what he viewed as the mismanagement of ADA resources to various internal and external entities." *Id.* at *1. The major question in that decision was not whether reporting run-of-the-mill employment discrimination could support an NDAA claim, but rather whether the Human Rights Act could support a disability-discrimination or retaliation claim for disclosing mismanagement of funds earmarked for providing disability accommodations (instead of bias against Talbot's own disability, which did not seem to motivate the alleged mistreatment). *See generally id.* The defendant there did not move to dismiss Talbot's NDAA claim. *Id.* at 1.

In the Court's view, Sargent has failed to state an NDAA claim.  Her reports of persistent sexual harassment were certainly not instances of "gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, . . . [or] a substantial and specific danger to public health or safety."  41 U.S.C. § 4712(a)(1).  It is conceivable that her report may have described "an abuse of authority" or "a violation of law, rule, or regulation," but both of those phrases specifically require that the abuse or violation be "related to a Federal contract"  *Id.*  To expand the reach of § 4712 to encompass any misconduct or illegal discrimination occurring within the context of a federal contract would stretch the statute's text beyond its plain meaning.

Because the Court concludes that Sargent's proposed amendment is both untimely and fails to state a claim, it need not reach SOC's arguments that Sargent's attempt to amend was unnecessarily delayed or prejudicial to SOC.  *See* SOC's Opp'n at 16.

## V.      Conclusion

Sargent has viable claims under Title VII and D.C. common law against her employer, SOC, but she cannot pursue the same claims against the State Department, which did not employ her and which is immune from her tort claim.  Moreover, Sargent's proposed additional count against SOC is barred by the statute of limitations and, in any case, fails to state a claim.  The Court therefore dismisses the State Department from this litigation, grants Sargent leave to add ¶ 166 of the Proposed Second Amended Complaint, and denies leave to amend as to the other proposed additions.  An Order will be issued contemporaneously with this Memorandum Opinion.

DATE:  September 11, 2020

CARL J. NICHOLS
United States District Judge

33