## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRACY S. SARGENT,

        *Plaintiff,*

   v.                                              Civil Action No. 1:19-cv-00620 (CJN)

SOC LLC,

        *Defendant*.

### MEMORANDUM OPINION

Tracy Sargent alleges that her former employer, SOC LLC, engaged in various forms of sex discrimination against her.   SOC has moved for summary judgment, *see* ECF No. 60, but because a reasonable jury could infer that SOC's purported reason for firing Sargent was pretextual, among other reasons, the Court denies that motion.   Sargent, for her part, has moved for leave to amend her complaint; because the proposed amendment would not be futile, the Court grants Sargent leave to amend.

### Background

In 2017, Defendant SOC contracted to provide security forces to the U.S. Embassy at the Baghdad Embassy Complex in Iraq.[1]  Major Dep. at 17, 67–68.  In June 2017, SOC hired Sargent to work as a Kennel Master, working with and overseeing others who worked with bomb-sniffing dogs.  Sargent Resume, ECF No. 60-16.  Sargent had approximately two decades of experience

---

[1] On SOC's motion for summary judgment, the Court must, of course, construe the facts in the light most favorable to Sargent.

handling canines in various security and law enforcement settings, including about two years in the Baghdad Embassy Complex for another contractor.  *Id.*

During Sargent's employment, SOC had a "zero-tolerance anti-harassment policy," *see* ECF No. 60-14, and conducted annual anti-harassment trainings, including for supervisors and managers.  Major 30(b)(6) Dep. at 39.  The trainings did not, however, expressly cover what to do when the customer is a harasser.  The policy stated:

> The Company strongly encourages the prompt reporting of all incidents of discriminatory harassment to Human Resources.  If an employee believes he or she is being harassed or has observed harassment, the employee should notify promptly his or her direct manager or any manager, including his or her direct manager.  Alternatively, employees may report their concerns to the Ethics and Employee Advocate Helpline[.]

ECF No. 60-14 at 3.  SOC also permitted employees to bring complaints to company leadership, including the VP of HR of Government Services or even to SOC's President.  Major Dep. at 32. The policy also provided that SOC would "undertake a prompt investigation" into an employee's complaints.  ECF No. 60-14 at 3.  That investigation should include discussing the complaint with whomever the employee is complaining against.  Rudisill 30(b)(6) Dep. at 36.  At least some SOC employees, as well as Donald Dolinger (SOC's State Department client contact), did not attend the sexual harassment training offered by SOC.  Dolinger Dep. at 99–100.

Sargent was deployed to Baghdad in mid-July 2017.  Sargent Dep. at 137–39.  At the Embassy Complex, she was one of five or six SOC Kennel Masters.  *Id.* at 145; Cotton Dep. at 11, 24.  One Kennel Master, Kyle Lindsey, was the Operations Kennel Master and had some supervisory oversight of the others.  Sargent Dep at 148–49.  The State Department employee

primarily responsible for overseeing the canine program during the relevant period was Donald Dolinger.  Dolinger Dep. at 14–15.[2]

Shortly after arriving in Baghdad, Sargent began recognizing biases against women and a sexually charged atmosphere.  Arnold Decl. ¶¶ 6–8; Wilkerson Decl. ¶ 11.  Lindsey frequently assigned undesirable or dangerous duties to the women.  Sargent's Sept. 14, 2017 Letter, at 9, ECF No. 61-12; Sargent Dep. at 183–84; *see also* Arnold Decl. ¶ 9.  Lindsey's supervisor, Howard Cotton, handed out velcro patches that said "Howie's Boys" and gave better assignments to his favorite K9 handlers, who were all men.  Arnold Decl. ¶ 6.  A number of male dog-handlers, including Lindsey, used inappropriate language, made frequent sexual comments, and catcalled female contractors, including Sargent.  *See, e.g.*, Sargent Dep. at 157 (inappropriate and sexual language), 158 (sexually demeaning expletives), 211–12 (leering); 215–16 (same); 216–17 (invasion of personal space); Kempton Decl. ¶ 6 (sexual gestures); Wilkerson Decl. ¶ 11 (observation of regular harassment); Becker-Spiker Decl. ¶ 5–10 (unprofessional norms and retaliation).

On one occasion, Sargent attended lunch with her two supervisors, Lindsey and Cotton, and the State Department contact, Dolinger.  Sargent Dep. at 202; Sargent Letter at 2.  Dolinger asked Sargent many personal questions, leered at her suggestively, and told her "you should have more than one boyfriend, you need many boyfriends."  Sargent Dep. at 202.  Cotton and Lindsey said and did nothing to shield Sargent from Dolinger.

In late July or early August, Lindsey went on emergency leave and Cotton placed Sargent in the supervisory role of Operations Kennel Master due to her professionalism and good work.

---

[2] Don Slavik also served in the same role for at least some period of time while Sargent worked at the Embassy.  *See* Dolinger Dep. at 14–15; Heasley Dep. 102, 159; Cotton Dep. 20–21, 151; Lindsey Dep. at 31.

Sargent Dep. at 148–50; Lindsey Dep. at 45. There was no change to Sargent's compensation or benefits—they were "equal positions" but with different responsibilities. Around this time Cotton went on leave to have surgery for a broken foot and did not return until the end of the year. Cotton Dep. at 45.

In late August, Lindsey returned from leave and took on some of Cotton's responsibilities. He removed Sargent from the supervisory role and installed males in supervisory roles. Sargent's Sept. 14, 2017 Letter, at 9. Lindsey ordered Sargent and the other female Kennel Master to stay in the office as much as possible. *Id.*; *see also* Sargent Dep. at 183–84. He also talked to Sargent about why she didn't socialize and told her that another female employee had previously been friendly but had turned into a "f****** b****." Sargent's Sept. 14, 2017 Letter, at 9; *see also* Cotton Dep. at 153; Sargent Dep. at 178–59.

On September 5 or 6, Sargent was told by Stephanie Ford-Shanks, who was responsible for assigning rooms at the Baghdad Embassy Complex, to move a dresser from one room to another for a new K9 handler. Sargent Dep. at 255–58. Sargent noticed there were some personal effects in the dresser, so went back and twice confirmed with Ford-Shanks that she was supposed to remove the dresser. *Id.* Ford-Shanks directed Sargent to remove the personal items from the dresser and place them on the bed, which Sargent did. *Id.* The dresser was too large for the new K9 handlers' room, so Sargent offered to give her dresser to the new handler and put the bigger dresser in her room. Ford-Shanks agreed. *Id.* Sargent told the men who helped her move the dressers to put the personal effects on the bed, which they did. *Id.* On September 6, Sargent sent an SOC K9 Handler an email thanking him "for your help with moving stuff last night." *See* ECF No. 60-32.

On September 13, Dolinger and two SOC employees asked to go with Sargent on her post checks outside the Embassy Complex. Sargent's Sept. 14, 2017 Letter, at 9.  Despite Sargent's attempt to drive in a separate car, Dolinger had her ride in his car and then made a variety of inappropriate comments.  *Id.*  On four occasions Dolinger said that she should kiss the Iraqi soldiers because they would "get off" on it; Dollinger and the two other SOC employees also discussed "porn, anal sex, whores, b******, drinking alcohol and getting drunk" and more.  *Id.* at 9–10. Sargent felt profoundly unsafe because she was outside the embassy compound on a dangerous patrol with people making degrading comments towards women.  *Id.*

Later that day, at a team meeting, Lindsey looked directly at Sargent and said that Dolinger is important to the team and they should do "whatever he wants to make him happy."  *Id.*  Sargent interpreted this as a direction to submit to Dolinger's sexual advances.  *Id.*

That day or the next day, Sargent sent an email complaint to Susan Major (SOC's Vice President of Human Relations for Government Services) and Steven Selfridge (SOC's President), along with a 19-page attachment in which she complained of numerous specific instances of harassment and misbehavior.  Sargent's September 14, 2017 Letter to Major and Selfridge, ECF No. 61-12.  Major forwarded Sargent's complaint to Bonnae Vega, who worked in SOC's HR department, and asked her to contact Sargent as soon as possible.  Sept. 14, 2017 Email Chain, ECF No. 60-23.

Vega, who believed Sargent's account of her treatment, Vega Dep. at 152; 168; Vega Email, ECF No. 61-14, contacted Sargent and told her she would immediately begin an investigation.  ECF No. 60-24.  Sargent requested to leave Baghdad.  *Id.*  Vega told Wayne Hall (SOC's Program Manager in Baghdad) to make arrangements for Sargent to return to the United States without an explanation why she was being removed.  Vega Dep. 148.  Sargent told Lindsey

and others she was leaving because her father was ill.  Sargent Dep. at 235, 240, 243; *see also* Sept. 15 Lindsey Email, ECF No. 60-22 ("Sargent is requesting other leave to go home due to her farther [sic] health.").[3]  All told, SOC got Sargent back into the States within about 24 hours.

Over the next few weeks, Vega talked with or emailed Sargent a few times and appears to have made some attempt to help Sargent locate other opportunities at SOC.  Sept. 19, 2017 Vega Email, ECF No. 60-29.   Sargent was open to returning to Iraq, and even to Baghdad, provided that SOC validated her complaints and made appropriate changes.  *See id*.   But the only positions discussed with Sargent were at a much lower salary.  It is unclear whether Sargent was paid while back in the States.  She was, however, planning to get an additional certification in November that could enable her to get another job.  *See id*.

SOC asserts that, shortly after Sargent's complaint, it conducted re-training at the Baghdad Embassy on its Code of Ethics.  *See* Heasley Dep. 85–86, 100–16, 107–109; Major 30(b)(6) Dep. 41–42, 45–46, 97.  And SOC claims that, consistent with its policy, it launched an investigation into Sargent's complaints.  ECF No. 60-14 at 3; *see also* ECF No. 60-24 (Vega email to Sargent stating "we . . . will immediately begin an investigation into your claims."); Vega's Email, ECF No. 61-14 (Vega telling SOC employees, including Thomas Healsey, that Sargent's complaint was serious and SOC may need to have some 1-on-1 conversations with people accused of misconduct).  But relatively few people remember the investigation and re-training, if they occurred.  Vega did not conduct any trainings while in Baghdad.  Vega Dep. at 71–72.  Heasley

---

[3] Both in the briefs and at oral argument, defense counsel repeatedly and peculiarly referred to Sargent's cover story as a "lie" or "lying."  The Court finds such references distasteful.  Sargent made serious accusations of harassment and misbehavior to the highest levels of the company.  Her reference to her father's health was a cover story to protect herself from retaliation or harm.  She did not deceive the company nor anyone with decisionmaking authority over her exit.  Continually characterizing Sargent's cover story in these circumstances to be a "lie" is unbecoming.

did not conduct any refresher courses or sexual harassment trainings as a result of Sargent's complaint.  Heasley Dep. at 81; Lindsey Dep. at 146.  Lindsey is not aware of anyone from SOC headquarters coming to Baghdad after Sargent left to investigate any of Sargent's allegations.  Lindsey Dep. at 204.   And no one asked Dolinger whether he had engaged in any sexual conversations with Sargent at any time.  Dolinger Dep. at 37–38.  There also appears to be no record of any completed investigation report.

On October 12, an SOC employee, Dexter Faulk, returned from leave and found numerous items missing from his room including a dresser, vacuum, and toolbox.  Dolinger Dep. at 50–51.  Faulk alerted Lindsey; Lindsey informed Hall; and Hall directed Lindsey to investigate.  Lindsey Dep. at 80–83.  Lindsey also informed the State Department counterpart, Dolinger, who also alerted his supervisor, Pate.  Dolinger Dep. at 29–33.

Lindsey asserts he delegated his investigation to others and passed on the information he received to Dolinger.  Lindsey Dep. at 84.  Dolinger interviewed Faulk, as well as three K9 handlers, Berry, Clymer, and Haney.  Dolinger Dep. at 33, 116–18.  According to Dolinger, Berry and Clymer asserted that Sargent told them to remove items from Faulk's room on September 6 and told them to take the dresser and any other items they wanted.  Dolinger Dep. at 34, 69; Lindesey Dep. at 87–90.  No one interviewed Sargent or got her side of the story.  Hearing of May 12, 2022.

On October 15, Dolinger informed Pate of his findings and Pate decided to issue a Loss of Confidence ("LOC") letter on behalf of the State Department.  Dolinger Dep. at 35–39.  Dolinger drafted the letter, which Pate signed.  Dolinger Dep. at 52–53.  The letter stated, in relevant part:

> Lindsey . . . investigated and found out that KM Tracy Sargent had asked two handlers to help carry a dresser to her room after saying that the handler (Faulk) was not coming back.  She also told the handlers that Dexter was not coming back so if they see anything they need they could have it.

Handlers Berry and Clymer after being told by the KM (Sargent) that Dexter was not coming back and could have whatever they needed took small items.  Once EDDH Faulk arrived back on post and had told KM Lindsey that his room had been entered and items were missing KM Lindsey found out that the two handlers had helped KM Sargent per her directive to assist in carrying a dresser to her room she advised them if they need anything it[] was theirs.  Items that were taken were returned to Dexter in the same condition as in which they were removed.

By Tracy Sargent['s] actions and the total disregard to abide by the standards of conduct that she acknowledged upon her employment with SOC.  She was in violation of the [the Standards of Conduct for State Department contractors] . . .

It is requested that Tracy Sargent be removed from Task Order 3 immediately.

LOC Letter, ECF No. 60-33.  The LOC letter noted that Lindsey was responsible for many of its findings.

The LOC letter concluded with a request that "Sargent be removed from Task Order 3"—the contract involving SOC at the Baghdad Embassy Complex.  *Id.*  But when an employee is the subject of an LOC letter, she cannot work on *any* contract with the State Department.  Vega Dep. at 78.  Such a letter is also fairly rare—Sargent's was the only one Dolinger worked on while in Baghdad, Dolinger Dep. at 46, though SOC receives one roughly every other month, Heasley Dep. at 61.

The day Pate signed the letter, Dolinger forwarded it to SOC.  Dolinger Dep. at 76–78.  Upon receipt of the letter, SOC did not undertake any independent investigation regarding its findings.  Major Dep. at 68.  Instead, Wayne Hall, the SOC Program Manager at the Baghdad Embassy Complex, was surprised by the LOC letter, *see* LOC Emails, ECF No. 61-17, yet decided to terminate Sargent's employment effective immediately.  *Id.*  SOC does not have a policy that an LOC letter requires termination, but it would typically terminate an employee hired for a particular contract upon receipt of such a communication.  Heasley Dep. 113; Major 30(b)(6) Dep. at 13, 14–15, 20–21; Major Dep., at 32.

8

Around this time, Sargent called Vega to inquire about the status of her complaint and SOC's investigation.  Sargent Dep. at 279.  At that point, Vega informed Sargent about the investigation into her moving a dresser, that an LOC letter was received about her, and that her employment had been terminated.  *Id.*

In December 2017 or January 2018, Cotton returned to Baghdad and talked with Dolinger about Sargent.  Cotton Dep. at 49–50.  Dolinger told Cotton there was a complaint against Dolinger and that he suspected Sargent was the source of the complaint.  *Id.*

At some point, some male SOC K9 handlers told a female K9 handler, Dawn Arnold, that they had "gotten rid of" Sargent and "chased her out."  Arnold Decl. ¶ 7.  Specifically, one handler Michael Stevens "openly bragged to [Arnold] that he was the one that had cleaned out the K9 handler's room" and "took what they wanted from the belonging in the room" and then set Sargent up to take the blame since she had already left.  *Id.*

In April 2018, the State Department rescinded the LOC letter.  ECF No. 60-35.  After its own review, it determined that Sargent should remain eligible for employment with companies under contract with the State Department for protective services.  *Id.*  SOC did not seek to rehire Sargent.  *See* Hearing of May 12, 2022.[4]

The events detrimentally affected Sargent emotionally, psychically, and mentally.  *See* Dr. Ash's Dec. 11, 2018 Evaluation, ECF No. 61-18 (significant emotional distress, chronic anxiety, loss of trust in employers, interpersonal isolation); Dr. Ash's Feb. 4, 2019 Addendum, ECF No. 61-19 (vomiting and acid reflux, chronic anxiety, depression, loss of trust in employers preventing employment);  Sargent's June 25, 2021 Supplemental Answers to Interrogatories, No. 14, ECF No. 61-20.

---

[4] Nor is there evidence Sargent sought to be re-hired by SOC.

*       *       *

Sargent filed this suit and asserts four claims against SOC—Title VII sex discrimination, hostile work environment, and retaliation, and D.C. common law intentional infliction of emotional distress.  SOC has moved for summary judgment on all claims.  Sargent opposes summary judgment as to Counts I, II, and III, and moves for leave to amend Count IV to include an allegation that SOC intentionally inflicted emotional distress by means of the same underlying conduct that gives rise to her other claims.

## Legal Standards

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the moving party has met its burden, the nonmoving party must then set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252. In other words, "there must be evidence on which the jury could *reasonably* find for" the non-moving party.  *Id.* (emphasis added). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255).

Although "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [her] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Baylor v. Powell*, 459 F. Supp. 3d 47, 53 (D.D.C. 2020) (quotation omitted); *see Williams v. Red Coats, Inc.*, 2021 WL 4476770, at *3 (D.D.C. Sept. 30, 2021).  As "conclusory allegations" and "unsubstantiated speculation" will not suffice to create genuine issues of material fact, "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 3d 143, 149 (D.D.C. 2020) (quotation omitted).

## Analysis

Counts I, II, and III are governed by the familiar three-step framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  At step one, Sargent must establish a prima facie case of discrimination or retaliation.  *See, e.g.*, *Esters v. Nielsen*, 2021 WL 722883, at *2 (D.D.C. Feb. 24, 2021).  If met, "the burden shifts to the employer to articulate some legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action." *Esters*, 2021 WL 722883, at *2 (citing *Jones*, 557 F.3d at 677).  Once completed, the "central question" for the Court is whether Sargent "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . sex [or, as applicable, intentionally retaliated against the employee]." *Brady*, 520 F.3d at 494 (citation omitted).

## I.   Count I Survives Because Sargent's Termination Gives Rise To A Reasonable Inference Of Sex Discrimination.

SOC argues that Sargent has failed to make out prima facie case of sex discrimination because she does not point to an adverse employment action that a reasonable jury could conclude

was discriminatory.  Def.'s Mem. at 19–23.  In particular, SOC contends that none of its actions before Sargent's termination constitute adverse employment actions, *id.* at 19–22, and as to her termination, it argues that no reasonable jury could conclude that it was discriminatory because SOC acted on the LOC letter it received from the State Department.  *Id.* at 23.

Sargent argues that she has a strong *prima facie* case and that a reasonable jury could conclude that SOC's proffered non-discriminatory reason was not the actual reason for her dismissal.  Pl.'s Opp. at 25–28.  Sargent contends that both the issuance of the LOC letter and her termination constitute adverse employment actions by SOC.[5]  *Id.* at 26–28.  And, she argues, a jury could infer discrimination because, among other reasons, two of the very people that Sargent asserts were harassing her—Lindsey and Dolinger—were the two people responsible for investigating the events that led to the LOC letter and her subsequent termination.  *Id.* at 28–32.

The Court agrees.[6]  At a minimum, Sargent's termination constitutes an adverse employment action for which a reasonable jury could infer sex discrimination.  To be sure, the LOC letter was ultimately issued by the State Department, and at least some employees at SOC

---

[5] At argument Sargent added two adverse employment actions she had not previously raised: her lack of pay for the month between her removal from Baghdad and her termination from SOC, and SOC's failure to re-hire her once State rescinded the LOC letter.  And after *Chambers v. D.C.*, 35 F.4th 870 (D.C. Cir. 2022), Sargent could conceivably assert other adverse employment actions. The Court declines to address such assertions because they were not briefed and the claim survives anyway.

[6] The Court does not agree with Sargent's argument that once a defendant proffers a nondiscriminatory reason for an action, the plaintiff is relieved altogether of the burden to prove a prima facie case.  *See* Pl.'s Opp. at 25.  When a defendant proffers a nondiscriminatory reason for an employee's termination, a court may grant summary judgment to the defendant if the plaintiff has not established evidence that a reasonable jury could conclude that reason was pretextual. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  In such circumstances, a defendant need not argue, and a court need not analyze the prima facie case before concluding a plaintiff has not met her burden.  But the plaintiff's burden remains.

appeared to take the LOC letter at face value.  But there are several reasons a reasonable jury could find this insufficient.

First, there is mixed evidence as to whether SOC undertook any significant investigation into, and re-training as a result of, Sargent's discrimination complaints.  *See Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (reasoning that an employer's deviation for established policies may be probative of pretext); *see Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 267 (1977).  SOC's Anti-Harassment Policy states that it "will undertake a prompt investigation appropriate to the circumstances," though it explains that investigative steps "vary depending upon the nature of the allegations."  ECF No. 60-14 at 3.  To its credit, SOC conferred with Sargent and, at her request, immediately removed her from Baghdad.  And there is some evidence SOC undertook some re-training and investigation.  But any re-training was focused on ethics generally, not sexual harassment specifically.  Heasley Dep. 85–86, 100, 107–109; Major 30(b)(6) Dep. 41–46, 97.  And the investigation appears quite brief—Vega did not interview Dolinger, Lindsey, Mike Stevens, or Ian Spivey, who were named in Sargent's complaints.  Vega Dep. at 69–72.  Lindsey is not aware of anyone from SOC headquarters coming to Baghdad after Sargent left to investigate any of Sargent's allegations of harassment.  Lindsey Dep. at 204.  And no one asked Dolinger whether he had engaged in any sexual conversations with Sargent at any time.  Dolinger Dep. at 37–38.  Relatedly, there is no clear evidence as to how seriously SOC tried to assist Sargent in finding a new position, or even whether she was paid after being removed from Baghdad.

Second, Sargent has pointed to substantial evidence of degrading and harassing conduct directed at her and other members of her protected class.  *See, e.g.*, Sargent Dep. at 157 (inappropriate and sexual language), 158 (sexually demeaning expletives), 211–12 (leering); 215–

16 (same); 216–17 (invasion of personal space); Kempton Decl. ¶ 6 (sexual gestures); Wilkerson

Decl. ¶ 11 (observation of regular harassment); Becker-Spiker Decl. ¶ 5–10 (unprofessional norms

and retaliation).  This could suggest pretext, *see Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir.

2006), but the probative value is somewhat limited because it's unclear the extent to which SOC

was aware of such conduct before it was reported.  *See Curry v. Dist. of Columbia*, 195 F.3d 654,

661 (D.C. Cir. 1999); *Johnson  v. Shinseki*, 811 F. Supp. 2d 336, 349 (D.D.C. 2011).

Third, and perhaps most significantly, Sargent provides evidence that SOC knew or had

reason to know the LOC letter was based on faulty facts.  *See Brady*, 520 F.3d at 495 ("[T]he

employee may attempt to demonstrate that the employer is making up or lying about the *underlying*

*facts* that formed the *predicate* for the employment decision.").  In particular, SOC had reason to

know that much of the investigation underlying that letter was done by two of the people who were

most prominent in Sargent's complaints of sexual harassment.  After all, the instigating event that

led Sargent to complain to HR and leave Baghdad appears to have been Sargent's supervisor,

Lindsey, telling her to submit to Dolinger's repeated sexual advances.  Sargent's Sept. 14, 2017

Letter, at 9.  Just one month later, those same two people (Lindsey and Dolinger) led an

investigation and, without ever asking for Sargent's version of events, concluded she was

responsible for the theft of Faulk's items.  And based only on Lindsey and Dolinger's conclusions,

the State Department issued the LOC Letter which—as SOC puts it—was the sole cause of

Sargent's termination.  The situation is sufficiently irregular that a reasonable jury could infer

pretext.

As SOC argues, there is no evidence that the person who made the decision to terminate

Sargent—Hall—had any discriminatory animus at all.  *See* Def.'s Reply at 15–17.  SOC analogizes

this case to *Hampton v. Vilsack*, 685 F.3d 1096 (D.C. Cir. 2012), where a subordinate with

discriminatory animus "initiated" a formal investigation into misconduct but there was no evidence that the subordinate "did anything but follow proper procedure," and there was no evidence that the ultimate decisionmaker was "in any way influenced" by the subordinate. *Id.* at 1101. But the analogy breaks down—Lindsey and Dolinger did not just initiate the investigation, they conducted it and made the findings. And there is evidence the investigation was not by the book—nobody even talked to Sargent about the allegations, and at least one K9 handler boasted about framing her.[7]

      SOC argues that there is no evidence that Hall had anything but an "honest belief" in the validity of the LOC Letter. *Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016); *see Brady*, 520 F.3d at 496 ("The question is not whether the underlying . . . incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incident occurred.") (emphasis added). But a jury could find such a belief was not a reasonable one. The letter expressly says that Lindsey investigated the incident and that Lindsey had concluded that Sargent had engaged in misconduct. ECF No. 60-33. As for Dollinger, while his name is not on the letter itself, he emailed it to SOC. ECF No. 62-11. Given the nature of Sargent's complaints against Lindsey and Dollinger (and, if it existed, the recent or ongoing investigation into their

---

[7] As noted above, some male SOC K9 handlers told a female K9 handler, Dawn Arnold, that they had "gotten rid of" Sargent and "chased her out." Arnold Decl., ¶ 7. One handler, Michael Stevens, "openly bragged to [Arnold] that he was the one that had cleaned out [Faulk's] room" and they all "took what they wanted from the belonging[s] in the room" and then set Sargent up to take the blame since she had already left. *Id.* SOC correctly asserts that Arnold's declaration contains hearsay, but hearsay can defeat summary judgment in some circumstances. At summary judgment, "a nonmovant is not required to produce evidence in a *form* that would be admissible at trial," so long as "the evidence [is] capable of being converted into admissible evidence." *Gleklen v. DCCC, Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (emphasis original); *see also Ciferni v. Nat'l R.R. Passenger Corp.*, 2022 WL 1124773, at *6 (D.D.C. Apr. 14, 2022). At trial, Sargent could call Stevens or other handlers to testify.

conduct towards Sargent), a jury could conclude that SOC (and therefore Hall) knew the LOC letter may not have been entirely reliable.

To be sure, Dolinger worked for the State Department, and the State Department—not SOC—issued the LOC Letter.  But "a request (or even a demand) from a client does not alleviate an employer's obligation[s]" under employment laws.  *Williams v. Red Coats, Inc.*, 2021 WL 4476770, at *6 (D.D.C. Sept. 30, 2021); *see, e.g.*, *Diaz v. Pan American Airways, Inc.*, 442 F.2d 385, 387 (5th Cir. 1971); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1274 (9th Cir. 1981).  There is a longstanding principle that "the employer has the ultimate responsibility for providing a nondiscriminatory working environment—even when third parties are creating discriminatory conditions" or imposing discriminatory demands.  *Sparenberg v. Eagle All.*, 2015 WL 6122809, at *6 (D. Md. Oct. 15, 2015) (collecting cases).

At least in combination, the above considerations are sufficient for a reasonable jury to infer that Sargent's termination was pretextual.  A jury could find that SOC knew the investigation underlying the LOC letter was affected by animus towards Sargent on the basis of her sex and her refusal to submit to one of the investigator's sexual advances.  Even if SOC's customer refuses to work with Sargent on the basis of such animus, SOC has an obligation not to let the customer's discriminatory preferences affect Sargent's terms, conditions, or privileges of employment.[8]

## II.   Count II Survives Because A Dispute Remains About Whether SOC's Preventative And Remedial Measures Were Sufficient.

SOC argues that Sargent's hostile work environment claim fails because no reasonable jury could find *respondeat superior* liability.  Def.'s Mem. At 24–27.  Specifically, it argues that an

---

[8] Sargent also contends the issuance of the LOC letter was itself an adverse employment action. The Court believes that is a closer call but does not reach the question at this time because the claim proceeds past summary judgment anyway.

employer is not liable unless the plaintiff "prove[s] that the employer knew of the harassment and failed to take prompt and appropriate remedial action." *Gordon v. Beers*, 972 F. Supp. 2d 28, 35 (D.D.C. 2013) (citing *Curry*, 195 F.3d at 660). And, SOC contends, it is undisputed that it had an anti-harassment policy and took prompt and appropriate remedial action by removing Sargent from Baghdad. Def.'s Mot. at 25–27.

Sargent responds that SOC's policies and responses were insufficient to prevent or remedy the harassment. Pl.'s Opp. at 33–37. Sargent argues that while SOC purports to have a "zero-tolerance anti-harassment policy," the evidence establishes that the policy was wholly ineffectual and harassment was rampant. Sargent also notes that there is little evidence of an investigation or re-training after SOC received her complaints, and no evidence of any admonitions or punishment for the harassers. *Id.* at 35–37.

To begin, the Supreme Court has explained the relevant standard:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (internal citation omitted). That is, to defend against vicarious liability, SOC would need to show *both* that it exercised reasonable care to prevent and promptly correct harassment *and* that Sargent unreasonably failed to take advantage of corrective opportunities. *See id.*

Here, there is a genuine dispute as to at least whether SOC exercised reasonable care to prevent harassment. While SOC has a written policy against harassment, a jury could conclude

that Sargent's supervisors observed, permitted, and even engaged in harassing her.  Sargent's Sept. 14, 2017 Letter, at 9 ECF No. 61-12; Sargent Dep. at 147–48, 223, 250.[9]  And the record reflects that, notwithstanding the policy, numerous instances of sexual harassment occurred.  A jury could find that SOC did not exercise reasonable care in overseeing its operations.

SOC makes a fair point that it took prompt remedial action upon receiving Sargent's complaint.  Def.'s Mem. At 26–27.  In particular, within about 24 hours of receiving Sargent's complaint, SOC had removed her from the allegedly hostile environment and brought her stateside.  But there is evidence that SOC also had long been aware of the conditions and did nothing—or supervisors even participated.  ECF No. 60-14 at 3.  And even if SOC's *response* was prompt (and appropriate), that prompt response must be coupled with reasonable care in the *prevention* of harassment for the *Faragher-Ellerth* defense.

There's also a dispute as to whether SOC's response, while prompt, was adequate.  The record doesn't reflect whether Sargent continued to be paid once removed from Baghdad.  And while SOC planned for an ethics training, it's not clear that it ever took place.  *See* Heasley Dep. at 81, 86–87.  The extent of its investigation is a matter of dispute.  Neither Lindsey nor Dolinger remember being talked to about Sargent's allegations.  Lindsey Dep. at 204; Dolinger Dep. at 37–38.

SOC emphasizes that its measures ended the alleged harassment.  *See* Def.'s Reply at 19–20.  And the record does suggest there have been no sexual harassment complaints against SOC at the Baghdad site since Sargent's complaint.  But while it may be that the remedial actions were

---

[9] SOC argues that Lindsey was Sargent's co-worker, not supervisor.  *See* Def.'s Reply at 19, n.12.  But that is not undisputed.  Sargent has provided evidence that Lindsey, as Operations Kennel Master, had some supervisory authority and that Lindsey stepped into Cotton's role while Cotton was out with a broken foot.  Sargent Dep. at 146–48, 223.

highly effective, it could also be (as Sargent alleges in Count III) that the retaliation against Sargent was swift and severe. In any event, SOC never corrected the situation in a manner that allowed Sargent to return to her job or to an equivalent position. And a jury could conclude (as discussed above) that her alleged harassers were responsible for her termination less than a month later. A jury could reasonably conclude that SOC's remedial measures were not enough.

In sum, there is sufficient evidence for a reasonable jury to conclude that SOC has vicarious liability for the hostile work environment claim.[10]

## III.   Count III Survives Because A Reasonable Jury Could Infer Retaliatory Motives.

SOC argues Sargent's retaliation claim fails on the causation element. Def.'s Mem. At 27–32. It argues that temporal proximity alone is insufficient to rebut a legitimate explanation for termination. *Ball v. George Washington Univ.*, 798 F. App'x 654, 656 (D.C. Cir. 2020). And here, SOC argues that none of the decisionmakers had any knowledge of her complaint. *See Vickers v. Powell*, 493 F.3d 186 (D.C. Cir. 2007). It contends that there is no evidence Pate was aware of Sargent's complaint before issuing the LOC letter. Nor, SOC argues, is there evidence that Hall (who terminated Sargent), Lindsey, or Dolinger had knowledge of Sargent's sexual harassment complaint either. And SOC reiterates that receipt of the LOC letter was a superseding cause of her termination.

Sargent argues that knowledge of her complaint should be imputed to Hall and SOC as a whole. Pl.'s Opp. at 37–42. Among other arguments, she contends that complaints made to an employer's Human Resources Department or to an employer's senior management give the employer, and by extension its managers and employees, constructive knowledge of the complaint.

---

[10] In the alternative, Sargent contends that it is inappropriate to resolve an affirmative defense (the *Faragher-Ellerth* defense) on summary judgment. Pl.'s Opp. at 35. Not so. Summary judgment turns on whether there is a genuine dispute as to a material fact, not who bears the burden of proof.

*See Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (reversing district court's grant of summary judgment because "the fact that [the plaintiff] submitted the complaint to the agency is sufficient" even if plaintiff could not show that the exact supervisors who made the termination decision actually knew of protected activity); *Saint-Jean v. D.C.*, 844 F. Supp. 2d 16, 22 (D.D.C. 2012).   And the LOC letter, she argues, was not an independent cause but was related to the retaliation:  even if she was terminated because of the LOC letter, the letter was sent because she had complained about sexual harassment.

The Court agrees with Sargent that there's enough here to survive summary judgment.  As an initial matter, SOC's receipt of the LOC letter does not automatically immunize SOC for similar reasons discussed above with respect to Count I—a reasonable jury could conclude SOC was involved in the promulgation of the LOC, and SOC's decision to ultimately terminate Sargent's employment without further investigation could give rise to an inference of pretext.

SOC argues that Hall himself did not know about Sargent's complaint.  But knowledge of the complaint can be imputed to company leadership, and thus to Hall.  *See Hamilton*, 666 F.3d at 1358.  Plus, those who carried out his direction to terminate Sargent (namely Vega) certainly did know about the complaint.  And, if SOC really engaged in a thorough investigation and sexual harassment re-training of its Baghdad staff, then a jury could infer that Hall could have (or should have) put two and two together.  After all, Sargent was one of relatively few female K9 handlers and she unexpectedly (and without explanation to Hall) left shortly before the investigation and re-training took place.  And she was removed without pay, given no equivalent position, and terminated all within a month of her protected activity.

SOC's purported legitimate explanation fails for the same reasons as the discrimination claim. *See supra* at § I.  To the extent relevant, there's enough in the record to suggest that Lindsey

and Dolinger were aware of Sargent's complaint before the LOC investigation.  A few months later—but before there was any new reason to find out—Dolinger told Cotton he knew of Sargent's complaint and thought it was about him.  Cotton Dep. at 49–50.  A jury could infer Dolinger likely knew by mid-October.  And, if the jury agrees with SOC that it did discipline and re-train its Baghdad employees, the jury could infer Lindsey and Dolinger were aware a complaint was made by Sargent and that it was about them.  After all, as SOC pointed out in its arguments about Count II, there is evidence SOC engaged in a prompt investigation, would conduct 1-on-1 interviews, and ensured its employees went through sexual harassment training.  Def.'s Memo. at 25–27.  Both would know their own actions towards Sargent, that Sargent was one of relatively few female K9 handlers, and that she left unexpectedly shortly before such harassment training took place.  A jury could find Lindsey and Dolinger sufficiently savvy to suspect Sargent complained about them.

## IV.    Leave To Amend Count IV Should Be Granted.

Sargent no longer defends Count IV as pleaded.  *See* Pl.'s Opp. at 42–45.  She instead moves to amend the IIED claim to be based on the underlying sexual harassment rather than, as currently pleaded, the retaliation for reporting the harassment.  *See* Hearing of May 12, 2022.  Sargent contends that she may plead alternative theories of liability.  Fed. R. Civ. P. 8(d)(2).  And while she acknowledges that she cannot pursue an IIED claim based on discrimination or retaliation, she contends that she can pursue such a claim based on the underlying conduct that gives rise to her claims—the harassment itself.  *See Boyd v. O'Neill*, 273 F. Supp. 2d 92, 95–96 (D.D.C. 2003).

SOC responds that amendment would be both futile (because Title VII preempts other claims for the same conduct, and there was no physical touching, *see* Def.'s Reply at 24–25), and

unfair (because it is past time for the amendment of pleadings and discovery is already complete, *see* Hearing of May 12, 2022).

The Court will grant leave to amend.  Leave to amend should be freely given, Fed. R. Civ. P. 15, and all of the underlying conduct at issue on this claim has been in the case from the initial pleadings.  *See* Compl., ECF No. 1.  This is no surprise.

And amendment would not necessarily be futile.  It appears Sargent could plead a prima facie case.  Under D.C. law, IIED claims require the (1) defendant engaged in extreme and outrageous conduct that (2) intentionally or recklessly (3) caused plaintiff severe emotional distress.  *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013); *Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011).

As to the first element, a plaintiff must show that the facts, in context of the environment in which the conduct took place, "go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Homan v. Goyal,* 711 A.2d 812, 818 (D.C. 1998); *Ortberg*, 64 A.3d at 163.  This is not an easy burden, but repeated sexual harassment in the workplace—particularly if supervisors are involved—can satisfy the first element.  *See Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C. 1984); *but see Homan*, 711 A.2d at 818 (no liability should be "imposed for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities") (quotation marks omitted).  The Court has reviewed the record and a reasonable jury could conclude there was severe and pervasive harassment.  *See, e.g.*, Sargent's Sept. 14, 2017 Letter; Sargent Dep. at 157 (inappropriate and sexual language), 158 (sexually demeaning expletives), 211–12 (leering); 215–16 (same); 216–17 (invasion of personal space); Kempton Decl. ¶ 6 (sexual gestures); Wilkerson Decl. ¶ 11 (observation of regular harassment); Becker-Spiker Decl. ¶ 5–10 (unprofessional norms and retaliation).  And a jury could

find that the setting of the harassment—the Baghdad Embassy Complex near military operations—aggravated the seriousness of the underlying conduct.  While not a clear call, the Court believes a reasonable jury could conclude the standard is met.  *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980).

The second element is similar.  A defendant's intent and recklessness can be inferred from the outrageousness of the acts and their context.  *Howard Univ.*, 484 A.2d at 985; *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980).  Given the pervasiveness and outrageousness of the harassment, a jury could conclude at least recklessness on the part of SOC.

As to the third element, D.C. law requires "emotional distress of so acute a nature that harmful physical consequences might be not unlikely to result."  *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007) (quotation marks omitted).  The physical consequences could include loss of sleep, inability to concentrate, or inability to work, particularly over an extended period.  *See Purcell v. Thomas,* 928 A.2d 699, 713–14 (D.C. 2007); *Homan,* 711 A.2d at 821.  The medical evidence shows Sargent could meet this element.  *See* Dr. Ash's Dec. 11, 2018 Evaluation, ECF No. 61-18 (significant emotional distress, chronic anxiety, loss of trust in employers, interpersonal isolation); Dr. Ash's Feb. 4, 2019 Addendum, ECF No. 61-19 (vomiting and acid reflux, chronic anxiety, depression, loss of trust in employers preventing employment).

And preemption is not at issue.  The cases SOC cites do not stand for the proposition that Title VII generally preempts IIED claims.  *See, e.g.*, *Johnson v. Mao*, 174 F. Supp. 3d 500, 522–23 (D.D.C. 2016); *Boyd v. O'Neill*, 273 F. Supp.2d 92, 96 (D.D.C. 2003).  Rather, some cases say that *federal employees* may not bring IIED claims, but that is because Title VII is the exclusive remedy for them—the federal government is not subject to actions based in state common law.  There is no such exception for private defendants.  And lack of a separate injury is irrelevant

because Sargent may plead causes of action in the alternative.  Fed. R. Civ. P. 8(d)(2).  Nor is the

lack of a physical touch relevant; unlike some jurisdictions, D.C. does not require such conduct

for an IIED claim.  *See Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013); *Hedgepeth*

*v. Whitman Walker Clinic*, 22 A.3d 789, 795 (D.C. 2011).[11]

**Conclusion**

Accordingly, the Court denies Defendant's motion and grants Plaintiff's leave to amend

Count IV.  An order will issue contemporaneously with this opinion.


DATE:  August 18, 2022

_____
CARL J. NICHOLS
United States District Judge

---

[11] SOC does not contest that D.C. law would apply to the IIED claim.